Kenneth A. CALDWELL, Appellant,

v.

STATE of Alaska, Department of Revenue, Child Support Enforcement Division, and Jakki Thornton, Appellees.

No. S–11149.

Supreme Court of Alaska.

Jan. 21, 2005.

Sarah J. Tugman, Anchorage, for Appellant.

D. Kevin Williams, Assistant Attorney General, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for Appellee State of Alaska.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

BRYNER, Chief Justice.

## I. INTRODUCTION

In December 2000, a year and a half after Kenneth Caldwell and Jakki Thornton divorced, Caldwell and other owners of Audio–Video, Inc., sold the company to a competitor; as part of the sale, Caldwell gave up his job at Audio–Video and agreed not to compete with the buyer for five years. Caldwell was paid his share of the sale proceeds, more than $500,000, in 2000 and 2001. More than a year later, however, in a proceeding filed to establish Caldwell's future child support obligation, the superior court ruled that the sale proceeds should be counted as annual income spread evenly over the five-year period of

Caldwell's agreement not to compete. Caldwell appeals this decision. We reverse, concluding that the sale proceeds were returned capital with one-time capital gains and, absent a finding of exceptional circumstances, could not properly be treated as five years of income for the purpose of determining Caldwell's duty to pay support.

## II. FACTS AND PROCEEDINGS

Kenneth Caldwell and Jakki Thornton divorced in May 1999. Thornton was awarded primary custody of the parties' two children. Caldwell was ordered to pay monthly child support based on his annual earnings at Audio–Video, Inc.—a closely held company in which Caldwell's father had given him stock comprising a minority interest and where Caldwell had worked since he was twenty years old. As part of the property distribution, Caldwell was also awarded his Audio–Video stock, which the court treated as being his separate property.

In December 2000 Caldwell sold his stock in Audio–Video. The sale was part of a larger transaction in which the company's majority shareholders apparently decided to sell out to a larger competitor. As part of the sale, Caldwell gave up his job and, together with Audio–Video's other shareholders, promised not to compete with the new buyer for five years after the sale. Caldwell received most of his part of the sale proceeds when the sale closed in December 2000 and was paid the rest in 2001—sums totaling about $553,210. After selling his shares and receiving these funds, Caldwell did not attempt to find a new job, relying on the proceeds to pay his child support and usual expenses.

Thornton moved to Mississippi in the summer of 2001. Caldwell requested a modification of the child custody arrangements and the superior court awarded him interim custody pending a child custody investigation. The custody award terminated his support payments and ordered Thornton to begin paying monthly support to Caldwell. Thornton failed to pay support while the children lived with Caldwell but resumed primary custody in July 2002 as recommended by the custody investigator. Her duty to pay monthly support then ceased, but she did not immediately move to renew Caldwell's child support payments.

Several months later, Thornton asked Alaska's Child Support Enforcement Division for help in obtaining support. In March 2003 CSED filed a motion asking the superior court to issue a child support order. Noting that Caldwell appeared to be voluntarily unemployed, CSED sought an order directing him to make monthly payments of $1,537—an amount calculated by imputing future earnings to Caldwell equaling CSED's estimate of his income during his last full year of actual work.[1]

Caldwell opposed CSED's motion, objecting that CSED's imputed income figure neglected to offset Thornton's unpaid support and was excessive in any event because it improperly included capital gains from his Audio–Video stock sale. Caldwell also denied CSED's claim that he was voluntarily and unreasonably unemployed, and he accused CSED of unfairly assuming that he could still earn as much as he did before losing his job at Audio–Video. He pointed out that he had sold his stock and lost his job "as a result of a corporate buy-out of a company in which he was a minority shareholder." He further emphasized that he was "subject, for several more years, to a non-compete agreement which does not allow him to work in Alaska in the only field in which he has training and experience." Moreover, according to Caldwell, he had used the buy-out proceeds to pay child support "at a much higher rate than he would have been required to pay based on his actual income during that time"; he had purchased private medical insurance for his children; and he had paid all their expenses when they lived in his custody and had received no support payments from Thornton. In summary, Caldwell insisted that he "probably at best could expect to find a minimum wage job. If he did, his income would ... result in a child

---

1. Caldwell's gross wages from his work at Audio–Video during the last year he worked there, 2000, were approximately $63,000.

support obligation of less than $400.00 a month." Calling CSED's proposed support payment "egregiously unfair," Caldwell asked the court to set his child support payments at $400.

CSED shifted grounds in replying to Caldwell's opposition. Abandoning its initial approach of imputing income to Caldwell because he was voluntarily unemployed, the agency proposed a revised theory of calculating his payment—one that increased its original request for support by characterizing the buyout proceeds as income replacing the five years of earnings that Caldwell gave up by signing the agreement not to compete:

> The stock sale is income that falls under [Alaska Civil Rule 90.3 Commentary III A. (3), (4), (5), (7), and (8)]. Because Mr. Caldwell has received money for agreeing not to work, and in fact is not working and instead spending this money, it is appropriate to divide the $553,210.00 received by five years (representing the duration of the non compete clause), and add in the anticipated permanent fund dividends over five years to calculate a gross annual income of $112,182.76. After allowing for deductions, Mr. Caldwell should pay $1,789.00 per month[.] (Internal references omitted.)

The superior court accepted this theory and issued a written order adopting the view that, for purposes of calculating Caldwell's child support payments, the sale proceeds equated to five years of future income:

> CSED's revised calculation does not impute income based upon the theory that Mr. Caldwell is voluntarily under employed. It is premised upon Mr. Caldwell's argument that the non-compete makes it impossible for him to work in his chosen field, and that the buy-out is therefore compensation for not working. Though Mr. Caldwell argues that the non-compete makes it impossible for him to achieve income comparable to the levels he earned before the company was sold, this argument reinforces the conclusion that the buy-out should be considered as compensation for not working for a period of five years and treated as income for purposes of calculating child support.

CSED amortized the entire buy-out over 5 years, and concluded that Mr. Caldwell could be fairly assessed with $112,182 in annual income. Mr. Caldwell correctly argues that this sum is significantly more than his annual income during the years when he was working in the company. However, a review of CSED's attached calculation shows that the income cap was applied and Mr. Caldwell's adjusted income for child support purposes was $79,524.

Using CSED's revised calculation, the court ordered Caldwell to pay monthly support of $1,708 as of July 2002, the month when the children left Alaska and reunited with Thornton in Mississippi.

Caldwell moved for reconsideration. His motion challenged the court's characterization of the sale proceeds as payment for five years of not working, renewed his original arguments, and supplied additional documentation to support his position. The superior court denied Caldwell's motion and confirmed its earlier ruling, explaining its decision concerning the sale proceeds as follows:

> Mr. Caldwell's implied argument is that a one-time sale of a capital asset cannot be considered to be a regular source of income. However, in this case the sale of stock was coupled with Mr. Caldwell's agreement not to compete in the same field for a period of five years. In fact, Mr. Caldwell represented that he "was unable to work much after" the sale due to this agreement and the limitation of other employment outside the audio-video industry suited to his education and training.... This appears to be the basis for Mr. Caldwell's assertion ... that his net annual income was approximately $13,300 subsequent to the sale.... However, the inescapable conclusion is that Mr. Caldwell treated the net proceeds received from the stock sale as a substitute source of income for the ensuing five-year period during which he would not be working in the audio-visual field. These proceeds constituted his primary source of income for the duration of the non-compete period. (Internal references omitted.)

Caldwell then filed this appeal.

## III. DISCUSSION

### A. Standard of Review

 We will reverse a superior court's child support order only for abuse of discretion or if the court applied an incorrect legal standard.[2] "Whether the trial court used the correct method of calculating child support is a matter of law, therefore we give no deference to the trial court's decision."[3] We review a superior court's findings of facts used to determine child support under the clearly erroneous standard.[4]

### B. Stock Sale Proceeds

 On appeal, Caldwell argues that the superior court erred in basing his future child support payments on an "old, one-time only, receipt of proceeds from the sale of personal property." He insists that "the proceeds were payment for an asset he sold," and also contends that the evidence fails to support the court's conclusion that the proceeds amounted to compensation for him not to work. We agree. The sale proceeds amounted to one-time capital gains, plus a return on capital.[5]

In treating the stock sale proceeds as a five-year stream of income, CSED and the superior court relied on the Commentary to Civil Rule 90.3.[6] But the commentary provides scant support for CSED's proposal.

Rule 90.3(a)(1) requires child support to be based on the non-custodial parent's adjusted annual income and looks to "the parent's total income from all sources" as the proper starting point for calculating adjusted annual income. These provisions are addressed in Part III.A. of the Commentary to Rule 90.3, which generally advises that the rule's key phrase—"parent's total income from all sources"—"should be interpreted broadly to include benefits which would have been available for support if the family had remained intact." The commentary goes on to list twenty-nine examples of items to be included as income. As one of these examples, the commentary specifically advises courts to include "capital gains in real and personal property transactions *to the extent that they represent a regular source of income.*"[7] Here, the superior court expressly acknowledged this provision but did not find it to be controlling and chose to give greater weight to other listed examples.

Specifically, the court cited Civil Rule 90.3 Commentary III. A. (3), (4), (5), (7), and (8), which lists items of income including severance pay,[8] royalties,[9] bonuses and profit sharing,[10] income derived from self-employment and from businesses or partnerships,[11] and social security.[12] But as Caldwell correctly points out, none of these examples neatly describes his situation, a one-time sale of corporate stock.

The court also placed weight on the commentary's general admonition that courts should interpret Rule 90.3(a) "broadly to include benefits which would have been available for support if the family had remained intact."[13] Yet invoking this broad interpretive principle here appears problematic for several reasons.

Because Caldwell's Audio–Video stock was apparently acquired by him from his parents and awarded to him in the divorce as non-

---

**2.** *Beaudoin v. Beaudoin,* 24 P.3d 523, 526 (Alaska 2001).

**3.** *Turinsky v. Long,* 910 P.2d 590, 593 n. 10 (Alaska 1996).

**4.** *Routh v. Andreassen,* 19 P.3d 593, 595 (Alaska 2001).

**5.** The record indicates that Caldwell's basis on the stocks was approximately $90,000.

**6.** Although the commentary to Rule 90.3 has not been officially adopted, we have previously noted that it can provide useful guidance in applying the rule. *See Eagley v. Eagley,* 849 P.2d 777, 779 (Alaska 1993).

**7.** Alaska R. Civ. P. 90.3 Commentary Part III. A.(16) (emphasis added).

**8.** *Id.* at (3).

**9.** *Id.* at (4).

**10.** *Id.* at (5).

**11.** *Id.* at (7).

**12.** *Id.* at (8).

**13.** Alaska R. Civ. P. 90.3 Commentary Part III.A.

marital property, it does not seem self-evident that Thornton would have been entitled to count on the stock or its sale revenues as a source of support "if the family had remained intact." More important, even assuming that the revenues could properly be counted as income available to the intact family, they would amount to income only to the extent that they represented capital gains.[14] And because they reflected a one-time sale and were non-recurring, the proceeds could at most qualify as income accruing only in the two years when proceeds were actually paid; absent an express finding of exceptional circumstances under Rule 90.3(c), CSED's proposal to spread two years of payments over a span of five years would directly conflict with the policies underlying Rule 90.3's cap on annual income.

In reaching the contrary conclusion and treating the sale proceeds as a five-year income stream, the superior court found it determinative that Caldwell agreed to a five-year non-compete agreement that left him unable to work much after the sale. But these findings are as problematic as reliance on the commentary to Rule 90.3. They hinge on the assumptions that Caldwell voluntarily chose to sell his business to a competitor, that he separately opted to sign a five-year agreement not to compete, and that the entire payment amount was attributable to the agreement not to compete. As it currently stands, the record does not fairly support these assumptions. Caldwell has consistently asserted that he owned a minority interest in Audio–Video; CSED has not refuted, or even contested, this assertion. As a minority shareholder, Caldwell potentially had no power to prevent the majority shareholders from selling the company.[15] Moreover, the covenant not to compete appears to have been an ordinary and integral condition of the contract for the company's sale, a provision that all shareholders were required to accept. We see no realistic basis, then, for viewing the sale proceeds as merely reflect-

ing a payment for Caldwell's willingness to sign the agreement not to compete.

The superior court appears to have faulted Caldwell to a certain extent for neglecting to fully explain the circumstances surrounding the sale and for failing to prove the exact value attributable to his promise not to compete. But CSED first raised its proposal to characterize the sale proceeds as a five-year revenue stream at a late stage in the case: when the agency filed its reply memorandum to Caldwell's memorandum opposing its original theory. CSED thus left Caldwell no opportunity to respond to its revised theory before the court issued its ruling. Caldwell's only recourse, then, was to seek reconsideration of a decision that had already been made. Moreover, as the proponent of the new theory, CSED had the primary burden of justifying this unusual method of calculation. Although Caldwell's superior knowledge of the sale's financial details might have given the court good reason to consider shifting part of the burden to him, the court never expressly did so; thus, when Caldwell moved for reconsideration, he lacked any clear notice of what the court expected him to show. Given this unusual procedural backdrop, we think it unfair to fault Caldwell for failing to make a more detailed showing.

While CSED attempts to support its view by distinguishing authorities cited by Caldwell, it cites no persuasive authority bolstering its own proposal to treat sale proceeds actually paid in 2000 and 2001 as a continuous five-year income stream. Moreover, even if we accepted the premise that CSED's proposed approach might be appropriate in certain unusual settings, the existing record indicates that this approach presents an unrealistic picture of the transaction disputed here.

On the one hand, even assuming that Caldwell actually wanted to sell the business, had a say in the matter, and actively negotiated the covenant not to compete as a way to

---

14. *See, e.g., Robinson v. Robinson,* 961 P.2d 1000, 1003 & n. 3 (Alaska 1998) (allowing noncustodial spouse's sale of land to be treated as income, but only to extent that the proceeds represented capital gains or payments of interest).

15. *Cf. Alaska Plastics, Inc. v. Coppock,* 621 P.2d 270, 273–74 (Alaska 1980) (noting that "majority shareholders who control [and] operate policy are in a unique position to 'squeeze out' a minority shareholder").

avoid five years' work, we see no evidence to justify valuing his promise not to compete as being worth more than he would have earned had he remained employed at Audio–Video—earnings that would evidently lead to an adjusted income falling well below one attributed to him under CSED's five-year income-stream method. Caldwell's post-sale willingness to remain unemployed does not point to a different conclusion. To the contrary, uncontroverted evidence offered by Caldwell seems to show that he maintained a modest lifestyle after the sale, spending only limited amounts of the proceeds for his ordinary living expenses—a pattern strongly supporting Caldwell's position that the proceeds were not merely a substitute for five years of lost earnings. Even viewing the record in the light least favorable to Caldwell, then, it does not realistically support valuing the proceeds as exceeding Caldwell's prior earnings.[16]

On the other hand, if we assume that Caldwell had no voice in bringing about the sale, that he involuntarily lost his job and his ability to obtain similar work, and that he has accurately described the limited extent of his current earning capacity—issues that were left unresolved below—then his willingness to remain unemployed and use sale proceeds for support would at most demonstrate little more than a "voluntar[y] and unreasonabl[e]"[17] choice to forgo a limited regular income—an income worth only a fraction of the one that he formerly earned.[18] Viewed in the light most favorable to Caldwell, then, the record would support treating only a minor part of the proceeds as continuing income.

Accordingly, although we recognize that these differing views of the record could easily support different child support calculations, we hold that no tenable view of the record could justify dividing the entire amount of the proceeds into five equal annual income payments accruing under Rule 90.3(a).[19]

We emphasize that this holding does not necessarily mean that the sale proceeds could have no further bearing on the appropriate level of Caldwell's child support payments.

The continued availability of these funds could conceivably be treated as an exceptional factor warranting some increase in Caldwell's support obligation.[20] But reliance on the proceeds' availability as an exceptional factor warranting further adjustment could only be justified if the superior court considered the totality of the circumstances, including the children's need for support and Thornton's income, and only if it then made express findings conforming to the requirements of Rule 90.3(c)—a matter that the superior court has not yet considered.[21]

## IV. CONCLUSION

We therefore REVERSE the child support order and REMAND for further proceedings

---

**16.** *Cf. Ogard v. Ogard*, 808 P.2d 815, 819–20 (Alaska 1991) (suggesting that special circumstances to justify imputing income under Rule 90.3(c) might arise if non-custodial parent liquidated income-producing assets and reinvested them to avoid producing income in order to lower child support payments).

**17.** Alaska R. Civ. P. 90.3 Commentary Part III.C.

**18.** *See Johansen v. State*, 491 P.2d 759, 769 (Alaska 1971) (citing *Houger v. Houger*, 449 P.2d 766, 770 (Alaska 1969) for proposition that a parent's inability to work at a chosen trade doesn't excuse child support obligation or justify failure to seek other work).

**19.** Our decision makes it unnecessary to decide other points raised in Caldwell's briefs.

**20.** As we have recognized on other occasions, "when a court is asked to reduce a child support obligation where the parent seeking the reduction is temporarily employed at an income level that does not accurately reflect past and future income levels, the court may properly consider the availability of liquid assets to satisfy an ongoing child support obligation." *Patch v. Patch*, 760 P.2d 526, 530 (Alaska 1988); *see also Nass v. Seaton*, 904 P.2d 412, 416 & n. 8 (Alaska 1995) (gift to obligor parent not income under Rule 90.3 but may be considered under 90.3(c) if clear and convincing evidence shows that variation to include gift is necessary to avoid manifest injustice); *cf. Clemans v. Collins*, 679 P.2d 1041, 1041–42 (Alaska 1984) (parent's imprisonment amounts to changed circumstance for modifying support absent showing that parent has income *or assets* from which support can be paid); *Houger v. Houger*, 449 P.2d 766, 771 (Alaska 1969) (cited in *Patch* for proposition that ability to sell assets may be considered when parent disabled and unable to work).

**21.** *See Nass,* 904 P.2d at 416 n. 8.

to establish Caldwell's support obligation in a manner consistent with this opinion.