*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| JULIE KILKENNY, | ) |
| | ) Supreme Court No. S-18602 |
| Appellant, | ) |
| | ) Superior Court No. 3AN-21-04024 CI |
| v. | ) |
| | ) O P I N I O N |
| STEVE KILKENNY, | ) |
| | ) No. 7787 – September 19, 2025 |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Josie Garton, Judge.

Appearances: Jahna M. Lindemuth and Samuel G. Gottstein, Cashion Gilmore & Lindemuth, Anchorage, for Appellant. Darryl L. Thompson, Darryl L. Thompson, P.C., Anchorage, for Appellee.

Before: Maassen, Chief Justice, and Carney, Borghesan, and Henderson, Justices. [Pate, Justice, not participating.]

HENDERSON, Justice.

## I.     INTRODUCTION

This matter regards the enforceability of a prenuptial agreement following one spouse's commission of domestic violence against the other. Both parties signed a prenuptial agreement that significantly limited the wife's potential recovery in the event of divorce. In light of the husband's commission of domestic violence against the wife during the marriage, the superior court held unenforceable provisions that prohibited

the wife from seeking attorney's fees, prospective support, and an unequal division of the marital estate.  It otherwise enforced the agreement.

On appeal the wife argues that the superior court erred in determining that she entered into the prenuptial agreement voluntarily and in partially enforcing the agreement.  She also asserts that the court's final property division was flawed.  The husband argues that the wife signed the agreement voluntarily, and that the court's final property distribution and selective enforcement of the contract were fair and equitable and should not be disturbed.

For the reasons stated below, we affirm in part and reverse in part.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Julie and Steve Kilkenny[1] met and began dating in 2000.  They married in 2002, soon after the birth of their first child.

The parties signed a prenuptial agreement ten days before their wedding.  The agreement provided that each party agreed to retain their own "personal property" acquired before or during the marriage as separate property.  This included retirement accounts, bank accounts, and debts.  The agreement also limited the acquisition of marital property, characterizing each party's salaries, wages, and employment benefits earned during the marriage as separate property.  Any of the non-owning spouse's "contributions of labor or capital" to the owning spouse's separate property were deemed gifts, unless otherwise agreed in writing.  The prenuptial agreement further provided that in the event of divorce, the parties agreed to be responsible for their own attorney's fees, that joint assets and joint liabilities would be divided "as equally as possible," and that neither could pursue a claim for spousal support or alimony.

---

[1]    Because the parties have the same last name, we refer to them by first name for clarity.

Both Julie and Steve signed the prenuptial agreement before a notary public. The agreement contained Julie's written verification under oath that she read the agreement before signing it, that she signed it freely and voluntarily, and that Steve had offered to pay for separate counsel and Julie had declined. The property schedule attached to the agreement indicated that at the time of signing, Julie had $14,000 in separate property consisting of a checking account and a retirement account. Steve had approximately $1,600,000 in real estate and securities, $573,000 in cash and retirement accounts, and $379,000 in "miscellaneous" property.

Julie and Steve had another child in 2011. About eight years later, after nearly eighteen years of marriage, Julie filed for divorce. In response, Steve filed a motion to enforce the parties' prenuptial agreement.

### B.    Proceedings

#### 1.    Divorce trial

The superior court held a divorce trial over five days spanning May and June 2022. During the divorce proceedings, Julie stayed in the Anchorage home that Steve owned while Steve stayed elsewhere. Steve paid the property insurance, taxes, and utilities on the home, while Julie paid for food, gas, car and health insurance, car and house maintenance, and child-related expenses.

The court heard extensive testimony about Steve's violent conduct toward Julie throughout their relationship. The parties also testified about the circumstances leading up to the prenuptial agreement and their separate and marital property.

##### a.    Testimony about domestic violence

Julie testified that Steve was physically aggressive toward her throughout their relationship. She said the first violent incident took place before they were married, describing how during a trip to Thailand he "slammed [her] up against a car and held [her] there by [her] throat." She described other incidents in which Steve hit her and testified that she had called the police on him multiple times over the years.

Julie testified that Steve had a problem with alcohol and that her negative experiences with Steve all occurred when he was under the influence.

Both Julie and her son testified about the circumstances that led to the parties' separation in December 2020, describing how Steve, who appeared to be intoxicated, cut his hand, smeared blood all over the house, and told Julie he was going to make her "disappear." Julie called the police during that incident, and later obtained a domestic violence protective order (DVPO).

### b. Testimony about prenuptial agreement

The parties offered contradictory testimony about the events surrounding the signing of the prenuptial agreement in July 2002.

Julie testified that she did not recall Steve telling her about the prenuptial agreement before they arrived at the attorney's office to sign it. She said he took her to the attorney's office, told her the agreement was "just something that had to be done" before the parties could get married, and that "everything would be fine." She recalled spending "at the most" 30 minutes at the attorney's office and said she did not remember reading the prenuptial agreement before she signed it.

Steve testified that he talked with Julie about getting a prenuptial agreement on multiple occasions. He remembered that on the day they signed the agreement, his attorney went through all of the terms with both parties and asked if they had any questions. He also recalled that he offered to pay for Julie to get her own attorney before signing the agreement, but that Julie declined because she had no reservations about the agreement.

The lawyer who prepared the prenuptial agreement also testified. He did not remember specific details about the day Julie and Steve signed the agreement, but said that it would have been his "universal practice" to go through every item in Julie's verification under oath to confirm that she was signing the agreement voluntarily, that she had an ability to seek counsel and declined it, and that had she reviewed the document before signing it. He said he "would not have normally gone through the

entire agreement line by line," but he would have given the parties time to review it in his conference room before signing it. He recalled making note of a phone message he received from Steve after providing him a second draft of the prenuptial agreement and before the parties signed it. That note reflected that Steve wanted the lawyer to schedule a signing appointment for the parties in another week to "give Julie a chance to review the document."

### c. Testimony about separate and marital property

Steve testified about two items that were listed as his separate property in the prenuptial agreement: a Wells Fargo account worth $288,570 at the time of signing, and a timeshare in Mexico. Regarding the Wells Fargo account, he reported that when the economy crashed in 2008, he took $250,000 out of the account and placed it in a safe deposit box that he and Julie had opened together. He said that after "the financial situation stabilized in the country," he put the bulk of the money back into one or more separate accounts. Regarding the Mexico timeshare, he testified that he had stopped paying the yearly fee and "walked away" from it during the marriage.

Julie testified about marital property that she and Steve acquired together during their marriage. She said that she and Steve had purchased two timeshares, one in California and one in Hawaii. She said she signed papers to authorize the sale of the timeshares while the divorce was pending, but that while she received $7,000 for the sale of the Hawaii timeshare, she had not received any proceeds from the sale of the California timeshare. Julie also testified that she and Steve shared a checking account that was worth $140,000 when they separated. She told the court that after she and Steve separated, she took $100,000 out of that account, but put $20,000 back after talking with an attorney.

### 2. Superior court order

The superior court issued a decree of divorce in September 2022, awarding Julie primary physical and sole legal custody of the couple's minor child. It

also made findings of fact and conclusions of law regarding two main disputed issues: the enforceability of the prenuptial agreement and the division of property.

Before ruling on those issues, the court noted that during the trial there were many instances "where the parties' accounts of what occurred . . . were apparently irreconcilable," and found that Julie's testimony was generally more credible. The court described in detail the testimony indicating that Steve was violent and controlling toward Julie throughout their marriage. It found that Steve had committed four crimes of domestic violence against Julie.[2] It also noted that there were other incidents that did not technically amount to domestic violence but which were nevertheless "concerning" and "disturbing," such as when Steve slashed the tire of Julie's car while armed with a baseball bat.[3]

### a.    Enforceability of prenuptial agreement

The court first analyzed whether the prenuptial agreement was enforceable, as Julie had argued that it was invalid as a matter of law. The court approached this as a mixed question of law and fact[4] and explained that enforceability requires a two-step inquiry.[5] The court must first consider "whether the agreement was

---

[2]    *See* AS 11.56.740(a)(1) (defining crime of violating protective order); AS 11.41.230 (assault in the fourth degree). The court found that the incident in which Steve slammed Julie against the car before they were married as well as an incident during which he attacked her while she was sleeping and accused her of having an affair constituted assault, and also found that Steve committed two violations of the DVPO.

[3]    The court found that the tire-slashing incident was not technically a crime because Steve owned the car. *See* AS 18.66.990(3)(E) (defining domestic violence involving criminal mischief); AS 11.46.484(a)(1) (defining criminal mischief in the fourth degree).

[4]    *See Andrew B. v. Abbie B.*, 494 P.3d 522, 529 (Alaska 2021).

[5]    *See id.* at 529-30 ("explaining that prenuptial agreements must meet certain standards of fairness and that the" inquiry into fairness is both procedural — whether the agreement was freely entered into — and substantive — whether the terms of the agreement are unconscionable).

voluntary," and then decide whether the agreement "was unconscionable when executed or whether circumstances have changed, making enforcement unfair and unreasonable."**6**

In applying the first step, the court found that Julie had entered into the prenuptial agreement voluntarily. It stated that while the circumstances surrounding the signing of the agreement "suggest that [Julie] was an unequal bargaining partner, had little time to consider whether to enter into the agreement, did not negotiate any terms, and was repeatedly told by [Steve] that he would take care of her, she did understand what she was signing and exercised a choice." The court also found that although Steve had committed one act of domestic violence against Julie a year before the signing of the prenuptial agreement, Julie's decision to sign did not appear to be "the product of coercive control."

In applying the second step, the court found that the terms of the agreement were not so unconscionable as to make the prenuptial agreement entirely unenforceable. However, it concluded that circumstances had changed such that some of the provisions of the agreement had become "unfair or unreasonable."

It found that the initial terms of the agreement ensured that "all of the financial power in the relationship resided with" Steve, which later "played into the domestic violence dynamics between the parties." It described how Steve would "periodically tak[e] away her money and credit cards to punish her," which it characterized as an "element[] of a domestic violence relationship and coercive control." It noted that Julie had testified that she did not have the financial resources to leave Steve, and it concluded that the prenuptial agreement essentially "locked [her] into an abusive relationship." It also noted Steve's testimony that "the marriage was essentially the only benefit" to Julie under the terms of the prenuptial agreement, and

---

**6**     *Id.* at 536.

reasoned that Steve's "commission of domestic violence frustrated that purpose and benefit."

It noted that Alaska law favors the public policy of encouraging legal representation in domestic violence situations "as a way to offset" the unequal bargaining power created by one spouse's abuse of the other. It therefore concluded that it would be unfair to enforce the term of the agreement that prohibited Julie from seeking attorney's fees. It also concluded that it would be unfair to enforce those terms that prohibited her from seeking an unequal division of the marital estate or spousal support. It left the other terms of the agreement intact.

### b. Division of marital estate and identification of separate property

The court then turned to dividing the marital estate. It explained that it was applying the *Merrill* factors, which are the requisite considerations in determining property division and include things like the ages of the parties, their earning ability, and their conduct during the marriage.[7] It found that although Julie was younger than Steve, their wage-earning capacities were likely similar given that Steve had experienced some cognitive decline, which would favor an equal distribution. But it found that other factors, such as Steve's greater wealth and the parties' conduct during marriage, supported an unequal distribution in favor of Julie. It therefore awarded Julie 75% of the marital estate. The court factored into the final property distribution the $80,000 that Julie had withdrawn from the parties' joint bank account at separation. Rejecting Julie's argument that those funds should be considered interim spousal support, the court counted those funds as part of her share of the marital estate. In total

---

[7]     *See Merrill v. Merrill*, 368 P.2d 546, 547 n.4 (Alaska 1962) (principal factors to be considered by trial court are "respective ages of the parties; their earning ability; the duration and conduct of each during the marriage; their station in life; the circumstances and necessities of each; their health and physical condition; [and] their financial circumstances"); AS 25.24.160(4) (codifying *Merrill* factors).

Julie was awarded $109,000 of the marital estate, plus an equalization payment of $65,000, and Steve received $117,000.[8]  The proceeds from the sale of the parties' shared California timeshare did not appear in the distribution.

Consistent with the terms of the prenuptial agreement, the court did not consider invasion of either party's separate property.  The court found that Steve's separate property included the Anchorage home he had acquired before his marriage to Julie, as well as most of the furnishings and artwork it contained, worth about $1,530,000 at the time of divorce.  In addition he had a separate brokerage account and individual retirement account worth about $1,550,000.  The court determined that Steve's transfer of money in response to the 2008 recession did not demonstrate an intent "to donate the cash to the marital estate," so that money was deemed his separate property.  And it found that Julie's separate property consisted of a retirement account worth about $13,000 and a bank account containing approximately $8,000.

### 3.  Denial of motion for reconsideration

Julie filed a motion for reconsideration in October 2022.  She asked the court to reconsider its conclusion that the prenuptial agreement was enforceable in part, arguing that she was coerced into signing it and that it was unconscionable.  She argued that the court failed to factor the proceeds from the sale of the parties' shared California timeshare into its final distribution, and asked it to include this asset in its calculation.  She also argued that the court should have classified the $80,000 that she removed from the joint account at separation as interim spousal support, because she had used that cash to pay for "normal living expenses."  Finally, she asked the court to reconsider its

---

[8]    On reconsideration these figures were updated due to slight miscalculations.

final property division and to classify the Anchorage home as marital.[9] Steve generally opposed reconsideration of all points.

The court denied reconsideration of all issues relevant to this appeal.

### 4. Child support order

Two weeks after denying Julie's motion for reconsideration, the court responded to proposed child support orders from both parties. In order to determine Steve's obligation, the court had to determine his income. Julie had argued that the child support award must take into account mandatory distributions from Steve's retirement accounts and proceeds he received when he sold securities. The court agreed that mandatory distributions from Steve's retirement accounts must be factored into its award, but determined that "the proceeds of any sale from securities" should be excluded because he incurred a loss from the relevant sales. It ordered Steve to submit an updated proposed order reflecting those figures.

In response, Steve submitted updated figures that included mandatory distributions from his retirement accounts. He listed a 24% federal income tax rate, asserting that his total income should be reduced by 24% to determine his "adjusted annual income" for purposes of child support.[10]

Julie objected to Steve's calculation, asserting that only the taxes that Steve "actually paid" should be deducted from his income. She also reiterated that the sale of Steve's securities should be included in his adjusted annual income.

---

[9]     In her motion for reconsideration, Julie also argued for the first time that the house should have been awarded to her. Julie renews this argument on appeal, but we agree with Steve that she failed to preserve the argument when she did not raise it at trial. *See Katz v. Murphy*, 165 P.3d 649, 661 (Alaska 2007). We also note that Julie in fact conceded at various points before and during trial that the home was Steve's separate property.

[10]     *See* Alaska R. Civ. P. 90.3(a)(1)(A)(i) (outlining that federal tax is deducted from parent's total income when calculating child support awards).

The court issued a final child support order in February 2023. It rejected Julie's arguments about taxes, relying on Steve's claimed tax rate of 24% to calculate his adjusted annual income. It also factored into its award mandatory distributions from Steve's retirement accounts, but did not incorporate the proceeds from Steve's securities sales as Julie had argued for. The court ordered Steve to pay child support of $1,261.57 each month, but granted him a monthly credit for $1,156 in Social Security retiree dependent benefits, also known as children's insurance benefits (CIB).[11]

Julie appeals the child support award, as well as the court's enforcement of portions of the prenuptial agreement, its division of the parties' assets, and its decision not to award interim spousal support.

## III. STANDARD OF REVIEW

We review the enforceability of a prenuptial agreement de novo.[12] We also review whether the court used the "correct legal standard for determining a contract's enforceability . . . de novo."[13] The question of whether a party voluntarily signed a prenuptial agreement "is one of fact," so we review a court's finding in this respect for clear error.[14] We review a court's decision to partially enforce or decline to enforce a prenuptial agreement based on changed circumstances at the time of dissolution for abuse of discretion.[15]

---

[11] *See Pacana v. State, Dep't of Revenue, Child Support Enf't Div. ex rel. Pacana*, 941 P.2d 1263, 1266 (Alaska 1997) ("We read Rule 90.3(h)(2) to allow an automatic credit against child support arrearage for CIB."). These benefits went to Julie.

[12] *Andrew B. v. Abbie B.*, 494 P.3d 522, 529 (Alaska 2021).

[13] *Id.*

[14] *Id.* at 529, 540. We reject Julie's argument that we should decide de novo whether an agreement was signed voluntarily.

[15] *See Brooks v. Brooks*, 733 P.2d 1044, 1051 (Alaska 1987) (stating "we find no per se abuse of discretion" in trial court's division of property during divorce in

The equitable division of marital property is a three-step process that involves "(1) determining the specific property available for distribution; (2) valuing the available property; and (3) equitably dividing property available for distribution."[16] As to step one, "the characterization of property as separate or marital may involve both legal and factual questions."[17] Findings regarding the parties' intent, actions, and contributions are factual questions.[18] "We review factual findings for clear error, which exists 'only when we are left with a definite and firm conviction based on the entire record that a mistake has been made.' "[19] Whether the trial court applied the correct legal rule is a question of law that we review using our independent judgment.[20] "The second step, the valuation of property, is a factual finding reviewed for clear error."[21]

We review the third step, equitable division of property, for abuse of discretion.[22] "An equal division of property is presumptively equitable, but the trial court has broad discretion in this area."[23] We also review a trial court's award of interim

---

accordance with parties' prenuptial agreement); *see also Compton v. Compton*, 902 P.2d 805, 809 n.4 (Alaska 1995) ("We will not enforce a prenuptial agreement if the facts and circumstances have changed since the agreement was executed so as to make enforcement unfair and unreasonable."); *cf. Long v. Long*, 816 P.2d 145, 152 (Alaska 1991) (establishing abuse of discretion as standard of review for determination that changed circumstances require modification of custody or visitation).

[16]     *Brennan v. Brennan*, 425 P.3d 99, 105 (Alaska 2018).

[17]     *Id.* at 104 (quoting *Beals v. Beals*, 303 P.3d 453, 459 (Alaska 2013)).

[18]     *Beals*, 303 P.3d at 459.

[19]     *Pasley v. Pasley*, 442 P.3d 738, 744 (Alaska 2019) (quoting *Hockema v. Hockema*, 403 P.3d 1080, 1088 (Alaska 2017)).

[20]     *Hanson v. Hanson*, 125 P.3d 299, 304 (Alaska 2005) (citing *Schmitz v. Schmitz*, 88 P.3d 1116, 1122 (Alaska 2004)).

[21]     *Pasley*, 442 P.3d at 744.

[22]     *Brennan v. Brennan*, 425 P.3d 99, 105 (Alaska 2018).

[23]     *Id.* at 106 (citing *Odom v. Odom*, 141 P.3d 324, 330 (Alaska 2006)).

spousal maintenance and award of attorney's fees and costs for abuse of discretion.[24] We will not disturb the trial court's division "unless it is clearly unjust."[25]

"We will reverse a superior court's child support order only for abuse of discretion or if the court applied an incorrect legal standard."[26] Similarly, we review the denial of a motion for reconsideration for abuse of discretion.[27]

## IV. DISCUSSION

### A. We Agree In Part With The Superior Court's Evaluation And Treatment Of The Parties' Prenuptial Agreement.

When determining the validity of a prenuptial agreement, a "court may consider whether it was unconscionable when executed or whether circumstances have changed, making enforcement unfair and unreasonable."[28] "The inquiry into fairness is both procedural — whether the agreement was freely entered into — and substantive — whether the terms of the agreement are unconscionable."[29]

#### 1. The court did not clearly err when it found that the agreement was signed voluntarily.

Julie contends the superior court clearly erred when it found that she was "an unequal bargaining partner, had little time to consider whether to enter into the agreement, [and] did not negotiate any terms," but that she "did understand what she was signing and exercised a choice whether to sign it." Steve argues that Julie

---

[24] *Johnson v. Johnson*, 836 P.2d 930, 933 (Alaska 1992).

[25] *Doyle v. Doyle*, 815 P.2d 366, 368 (Alaska 1991) (quoting *Wanberg v. Wanberg*, 664 P.2d 568, 570 (Alaska 1983)).

[26] *Caldwell v. State, Dep't of Revenue, Child Support Enf't Div.*, 105 P.3d 570, 573 (Alaska 2005) (citing *Beaudoin v. Beaudoin*, 24 P.3d 523, 526 (Alaska 2001)).

[27] *Brett M. v. Amanda M.*, 445 P.3d 1005, 1014 (Alaska 2019).

[28] *Andrew B. v. Abbie B.*, 494 P.3d 522, 536 (Alaska 2021).

[29] *Id.* at 530.

voluntarily signed the agreement and that the court's findings are supported by the evidence. We conclude that the court did not clearly err.

"[A] court must decline to enforce a prenuptial agreement if the party seeking to avoid enforcement proves that it was not voluntarily entered into."[30] "[C]ourts examining the voluntariness of a prenuptial agreement consider the amount of time given to sign, the ability to consult independent counsel, and the ability of the parties to understand the agreement."[31] We refer to these as the *Andrew* factors. "Because the question of voluntariness is one of fact," courts must consider "all the factors pertinent to whether [a spouse's] execution of [a prenuptial] agreement was truly voluntary."[32] However, "[n]o single factor is dispositive" when it comes to the "combined effect" of the these factors.[33]

Here, the court did not clearly err when it evaluated conflicting evidence and determined that Julie voluntarily signed the prenuptial agreement. While Julie claims that there was no factual basis for the court to determine the agreement was entered into voluntarily, we disagree. The agreement itself states that Julie swore under oath that she read the agreement before signing it, that she was afforded the opportunity to consult an independent attorney, and that she signed the agreement freely and voluntarily. The lawyer who prepared the document testified that it was his "universal practice" to go through these terms with the parties before signing. The lawyer also said that he had record of a note indicating that Steve wanted to wait a week to sign the agreement after he received the second draft because he "want[ed] to give Julie a chance to review" it. Although Julie points to her contrary testimony, the superior court was

---

[30]     *Id.* at 539.

[31]     *Id.* at 539-40 (footnotes omitted).

[32]     *Id.* at 540.

[33]     *Id.*

in the best position to weigh the conflicting evidence and to make the resulting findings regarding voluntariness.**34**

Julie also argues that the court "incorrectly looked only at whether Julie was coerced to sign the agreement, or whether she signed it under duress" when it determined that she signed the agreement voluntarily. Julie suggests that the court seemed to rely on a duress standard when it found that "[a]lthough [Steve] had committed an act of domestic violence the year before" the parties signed the prenuptial agreement, her decision was not "the product of coercive control."

While Julie is correct that a court need not find duress in order to conclude that a prenuptial agreement was entered into involuntarily, we disagree with her assertion that the court improperly applied a duress standard here. The court was attentive to the *Andrew* factors, balancing the facts that Julie had little time to consider the agreement, did not negotiate any terms, and was assured that Steve "would take care of her" against the facts demonstrating that she evidently understood what she was signing. In assessing whether she entered the agreement voluntarily, the court *also* looked to the more general circumstances surrounding the execution of the agreement. In light of Steve's act of domestic violence the year before the parties' entry into a prenuptial agreement and subsequent marriage, it asked whether the relationship between the parties was so coercive as to render Julie's assent involuntary despite her understanding of the agreement. Issues of coercion can be highly relevant to the voluntariness inquiry and can inform the court's assessment of the *Andrew* factors. We see no error in the court's approach to analyzing voluntariness or clear error in the

---

**34**    *Josephine B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 174 P.3d 217, 222 (Alaska 2007) ("We give particular deference to the trial court's factual findings when, as here, they are based primarily on oral testimony, because the trial court, not this court, judges the credibility of witnesses and weighs conflicting evidence.").

court's ultimate finding that Julie "did understand what she was signing and exercised a clear choice whether to sign it."

### 2. The court did not err when it found that the agreement was not unconscionable.

Regardless of whether Julie entered into the agreement voluntarily, and before addressing whether circumstances in the marriage changed the enforceability of components of the prenuptial agreement, we must also consider whether the agreement was unconscionable on its face at the time of execution and therefore would become entirely unenforceable.[35]

We have yet to define the contours of what constitutes an unconscionable prenuptial agreement. Julie points to the Washington Supreme Court's decision in *In re Marriage of Bernard*, which held that a prenuptial agreement "disproportionate to the respective means of each spouse" that limits "the accumulation of one spouse's separate property while precluding any claim to the other spouse's separate property" is unconscionable at the time of execution.[36] Here, Julie contends that the agreement she entered into with Steve was designed to maintain her status as "the economically disadvantaged spouse throughout the marriage."

Steve argues that the agreement allowed both parties "to continue separate ownership of the property they brought into the marriage, and to continue to invest, inherit, and acquire property in their own right." He contends that Julie's choice not to pursue her own career does not mean that the agreement was unconscionable at the time of execution. Additionally, Steve maintains — and the superior court found — that Julie understood the terms of the agreement and voluntarily signed it, unlike the wife in

---

[35]     *Andrew B.*, 494 P.3d at 536; *see also Horton v. Hansen*, 722 P.2d 211, 216 (Alaska 1986) ("Courts will not enforce contracts . . . that are unconscionable." (citing *Inman v. Clyde Hall Drilling Co.*, 369 P.2d 498, 500 (Alaska 1962))).

[36]     204 P.3d 907, 912 (Wash. 2009).

*Bernard*, who signed the agreement the day before the wedding with the understanding that it would be amended.[37]

The superior court held that the agreement was not unconscionable at the time the parties entered into it. While its terms favored Steve in that they tended to maintain the disparity in the parties' relative bargaining power, the court determined that the terms were not "so unreasonably favorable to him that the agreement was unconscionable on its face at the time it was entered."

We recognize that the question of conscionability here is a close one. On one hand, the terms of the prenuptial agreement, considered on their face, applied equally to each of the parties. On the other hand, as the superior court recognized, the parties' widely disparate separate resources and financial conditions at the time they married meant that, in fact, the terms of the prenuptial agreement favored Steve and maintained the financial disparity between them. The superior court acknowledged the impact of the agreement's terms in light of the parties' disparate resources and financial condition, but ultimately decided that the terms were not "so unconscionable that this alone render[ed] [the agreement] unenforceable."

The superior court carefully analyzed the voluntary nature of the agreement and made detailed findings of fact.[38] In light of our recognition that parties can make many different choices about how to structure their finances within a

---

[37]    *Id.* at 910.

[38]    Although the voluntariness with which parties enter an agreement and the conscionability — or lack thereof — of agreement terms involve separate analyses, we have recognized that a party's lack of any meaningful choice may render an agreement unconscionable. *See Mun. of Anchorage v. Locker*, 723 P.2d 1261, 1265-66 (Alaska 1986). Here, the superior court's findings regarding voluntariness were consistent with Julie having a meaningful choice about whether to enter into this prenuptial agreement.

marriage,[39] we conclude that the court did not err when it determined that the agreement was conscionable on its face at the time it was entered. We recognize the need to protect parties who are without bargaining power against the enforcement of one-sided agreements that provide them no consideration. But we are also cognizant of the importance of people's ability to choose how to structure various aspects of their married lives, including their finances and whether or to what extent they wish to maintain some separation of their finances.[40] Indeed, we have acknowledged that allowing people "to think through the financial aspects of their marriage" and to make those decisions prior to marriage can be a factor that encourages marriage.[41] Although a prenuptial agreement that effectively maintains a wide disparity in the parties' financial condition presents cause for concern and requires careful examination, we cannot say that two parties with disparate financial resources could never fairly enter into an agreement like the one at issue in this case.[42]

---

[39] *See Andrew B. v. Abbie B.*, 494 P.3d 529 (Alaska 2021) (recognizing benefit of "allowing couples to think through the financial aspects of their marriage before" marriage through prenuptial agreements (quoting *Brooks v. Brooks*, 733 P.2d 1044, 1050 (Alaska 1987))).

[40] *Id.*

[41] *Brooks*, 733 P.2d at 1050.

[42] *Cf. In re Marriage of Woodrum*, 115 N.E.3d 1021, 1052 (Ill. App. 2018) (reasoning that continued disparity between husband's and wife's resources throughout marriage does not, in itself, support conclusion that terms of prenuptial agreement were substantively unconscionable); *Rider v. Rider*, 669 N.E.2d 160, 164 (Ind. 1996) (holding agreement to be conscionable even if enforcement left "one spouse with virtually all of the real and personal property" because "[t]his is what the parties brought into their . . . marriage, and this is what they sought to protect"); *In re Marriage of Shanks*, 758 N.W.2d 506, 516 (Iowa 2008) (holding agreement to be conscionable because it left "both parties substantially in the same financial condition as they were before the marriage"); *Est. of Bell v. Est. of Bell*, 372 So. 3d 1008, 1017-18 (Miss. App. 2023) (explaining that nuptial agreement is "not rendered unconscionable just because it perpetuated the already existing disparity between the parties' estates" as it is not

**3. The court did not err by finding changed circumstances that rendered enforcement of certain terms of the prenuptial agreement unfair and unreasonable, but the court must further explain its analysis of all the terms.**

Having affirmed the superior court's conclusion that the agreement was not unconscionable on its face at the time of execution, we now turn to whether circumstances changed over the course of the marriage such that enforcement became unfair and unreasonable.[43] The superior court determined that Steve's abuse of Julie "frustrated th[e] purpose and benefit" of the agreement.[44] It concluded that it would be unfair to enforce the terms of the agreement that prohibited Julie from seeking prospective support, an unequal distribution of the marital estate, and attorney's fees. It left intact other restrictions, such as the characterization of salaries, wages, employment benefits, and property acquired during marriage as separate property.

As an initial matter, we conclude that it was within the court's equitable power to strike certain terms of the prenuptial agreement while leaving others intact based on changed circumstances. Julie argues that the superior court "did not have discretion to enforce certain terms while disregarding others." But while we agree that contract law generally allows for selective striking of terms as unfair only where they are unconscionable at time of *formation*,[45] we have observed that premarital agreements

---

appellate court's function "to relieve a party to a freely negotiated contract of the burdens of a provision which becomes more onerous than had originally been anticipated" (quoting *Sanderson v. Sanderson*, 245 So.3d 421, 428-30 (Miss. 2018))).

[43] *See Andrew B.*, 494 P.3d at 536 ("[T]he superior court may consider whether [a prenuptial agreement] was unconscionable when executed or whether circumstances have changed, making enforcement unfair and unreasonable.").

[44] *See id.* (stating marriage itself is consideration in prenuptial agreement, not adequacy of contract's provisions).

[45] *See* RESTATEMENT (SECOND) OF CONTRACTS § 208 (AM. L. INST. 1981) ("If a contract or term thereof is unconscionable at the time the contract is made a court

are "not entirely like other contracts."[46] "The parties 'do not stand at arm's length to each other; there is a relationship of the highest trust and confidence' at the heart of these agreements."[47] Therefore, we have more broadly held that when the superior court evaluates whether to enforce a "one-sided" contract, it may consider both whether it was unconscionable when executed and "*whether circumstances have changed*, making enforcement unfair and unreasonable."[48] We extend that logic now to hold that if a superior court finds that changed circumstances render certain *terms* of a prenuptial agreement unenforceable, it has the equitable power to selectively strike those terms without voiding the agreement in its entirety.

We find the Uniform Premarital and Marital Agreements Act (UPMAA) persuasive on this point. While Alaska has not adopted UPMAA,[49] we have occasionally looked to the uniform code for some insight into "the modern thinking on prenuptial agreements."[50] The UPMAA states that a "court may refuse to enforce a term of a premarital agreement or marital agreement if, in the context of the agreement taken as a whole . . . enforcement of the term would result in substantial hardship for a

---

may . . . so limit the application of any unconscionable term as to avoid any unconscionable result.").

[46] *Andrew B.*, 494 P.3d at 529-30.

[47] *Id.* at 530 (quoting 5 WILLISTON ON CONTRACTS § 11:8 (4th ed. Nov. 2020 Update).

[48] *Id.* at 536 (emphasis added); *see also Compton v. Compton*, 902 P.3d 805, 809 n.4 (Alaska 1995) ("We will not enforce a prenuptial agreement if the facts and circumstances have changed since the agreement was executed so as to make enforcement unfair and unreasonable." (citing *Brook v. Brooks*, 733 P.2d 1044, 1049 (Alaska 1987))).

[49] *See* Deborah F. Buckman, *Construction and Application of Uniform Premarital Agreement Act of 1983*, 33 A.L.R.7th Art. 2 § 2 & n.1 (2017).

[50] *Brooks*, 733 P.2d at 1049 (incorporating standards from UMPAA predecessor in final holding).

party because of a material change in circumstances arising after the agreement was signed."[51]  We adopt this approach as consistent with our observation that "prenuptial agreements are enforceable only 'if certain standards of fairness are met.' "[52]

We also note that this does not alter our holding in *Andrew B. v. Abbie B.* that superior courts may not "*rewrit[e]* a one-sided prenuptial agreement."[53]  In that case, the parties' prenuptial agreement referenced an investment account that would fund a residence for the wife in the event of divorce.[54]  But the part of the agreement pertaining to the account "contained only the words '*Not Used*,' and no such account was ever created."[55]  The superior court nevertheless ordered the husband to pay the wife an amount equivalent to the value of their marital home.[56]  We reversed, holding that the superior court could not rewrite the agreement by reading into it a promise that was not in fact made.[57]  We reiterate now that the superior court may not "interpret [an] agreement inconsistently with its terms."[58]  But so long as the superior court does not add terms that do not exist, its selective enforcement of certain terms in light of a

---

[51]  UNIF. PREMARITAL & MARITAL AGREEMENTS ACT § 9(f)(2) (UNIF. L. COMM'N 2012).

[52]  *Andrew B.*, 494 P.3d at 530 (quoting *Brooks*, 733 P.2d at 1049) (internal quotation marks omitted); *see also Compton*, 902 P.2d at 809 n. 4.  ("We will not enforce a prenuptial agreement if the facts and circumstances have changed since the agreement was executed so as to make enforcement unfair and unreasonable.").

[53]  494 P.3d at 536 (emphasis added).

[54]  *Id.* at 525-26.

[55]  *Id.* (emphasis in original).

[56]  *Id.* at 534.

[57]  *Id.* at 535-36.

[58]  *Id.* at 536.

material change in circumstances does not amount to the kind of "rewriting" that warranted reversal in *Andrew B.*[59]

We add, however, that when the superior court selectively enforces a prenuptial agreement based on changed circumstances, its explanation of why it affirmed certain terms but not others must be detailed enough to allow for meaningful appellate review.[60] Here, while the superior court did explain why it decided to strike certain terms, it did not clarify why it decided to enforce others. The superior court found that "conditions [had] changed that ma[de] enforcement of the agreement unfair or unreasonable," concluding that the domestic violence that Julie described "frustrated [the] purpose and benefit" of the contract.[61] It noted that Alaska law favors "legal representation in domestic violence proceedings" to make it easier for a person to leave an abusive relationship.[62] This adequately explains why the superior court chose not to enforce the parts of the agreement that prohibited Julie from seeking attorney's fees, spousal support, or an unequal division of the marital estate. But the court did not explain why it opted to enforce the terms of the agreement that restricted the accumulation of marital property and invasion of separate property, despite its observation that those terms "locked in the vast financial disparity between [the parties] by [e]nsuring that all of the financial power in the relationship resided with" Steve and that this financial disparity "played into the domestic violence dynamics between the

---

[59] *See id.*

[60] *See, e.g.*, *Mapco Express, Inc. v. Faulk*, 24 P.3d 531, 537 (Alaska 2001) (noting we will remand for more detail if trial court's findings are not "clear and explicit" enough to "allow for meaningful appellate review").

[61] *See Andrew B.*, 494 P.3d at 536.

[62] *Lee-Magana v. Carpenter*, 375 P.3d 60, 64-65 (Alaska 2016) (recognizing "strong policy arguments for encouraging legal representation in domestic violence proceedings" through award of attorney's fees to parties who prevail in petitioning the court for a DVPO).

parties." In light of those findings, we remand for the court to examine whether to enforce terms of the agreement central to Steve's abuse and control over Julie, particularly restrictions on building marital property and invading separate property,[63] and to explain more fully its decision to enforce or strike those terms.

**B.      It Was Error To Fail To Consider The California Timeshare.**

Julie argues that the court erred when it declined to factor the proceeds from the sale of the parties' California timeshare into the marital estate. Steve responds by noting that the court did not award the value of the timeshare to either party. The court, without explanation, declined to award the value of the timeshare to either party in its property schedule, and it also declined to later reconsider the issue. We conclude that it was error to fail to account for this marital asset.

On remand, the court should determine the value of the California timeshare and factor it into the marital estate. The court's failure to do so previously appears to have resulted from the parties' confusion regarding their multiple timeshares. In her motion for reconsideration, Julie asked the court to credit the value of the California timeshare in its final distribution. In his opposition to her motion, Steve recalled that he had testified during trial about "walk[ing] away" from the California timeshare, "losing any interest he may have had in the property." In its order on reconsideration, the court declined to reconsider the issue of the California timeshare

---

[63]      Alaska Statute 25.24.160(a)(4) explains that a superior court may decide to invade one spouse's property "when the balancing of the equities between the parties requires it" in accordance with the *Merrill* factors. In balancing the equities, we have interpreted AS 25.24.160(a)(4) to allow "a premarital asset to be treated as marital property only when necessary for a just and equitable property division." *Brooks v. Brooks*, 733 P.2d 1044, 1053 (Alaska 1987). Courts should not invade separate property in order to support a previously " 'extravagant' lifestyle," but rather to support the reasonable needs of the parties. *Odom v. Odom*, 141 P.3d 324, 340-341 (Alaska 2006). In determining "the reasonable needs" of the parties, courts should be mindful that "[t]he result of the property division must not lead to a widely disparate lifestyle between spouses, particularly when children are involved." *Id.* at 341.

"for the reasons set forth" by Steve. But Steve never testified that he walked away from the California timeshare — he testified that he "walked away" from his *Mexico* timeshare.[64] The Mexico timeshare was listed as Steve's separate property in the property schedule attached to the prenuptial agreement. On appeal Steve offers no meaningful argument about why the proceeds of the sale of the California timeshare should not be factored into the property division. Therefore, we remand this issue for the court to account for the California timeshare in its division of the parties' property.

> **C.** **The Court Correctly Determined That The Money Temporarily Placed Into A Joint Deposit Box Was Steve's Separate Property.**

Julie argues that the court erred when it declined to apply the presumption that a spouse who places separate property into a joint account intends to donate that property to the marital estate, asserting that Steve's placement of $250,000 into the parties' joint safe deposit box during the 2008 financial crisis indicated that he intended to donate that cash to the marital estate. Steve argues that the court's conclusion that the money remained Steve's separate property was correct. We see no error in the court's decision on this issue.

Julie correctly states the presumption.[65] But while it is true that Steve's placement of the money into a joint account is "presumptive evidence" of his intent to donate that cash to the marital estate, our decision in *Kessler v. Kessler* makes clear that this presumption "is not a proxy for the ultimate question: did the owning spouse intend to donate his or her separate property to the marital estate?"[66] Steve had the burden to

---

[64] In stating that he testified during trial that he walked away from the California timeshare while opposing Julie's motion for reconsideration, Steve cited the portion of the transcript referring to the Mexico timeshare.

[65] *See, e.g.*, *Miller v. Miller*, 105 P.3d 1136, 1142 (Alaska 2005) ("There is a strong presumption that placing separate property into a joint account demonstrates an intent to treat the property as marital.").

[66] 411 P.3d 616, 620 (Alaska 2018).

prove that he did not intend to donate the cash to the marital estate.[67]  He testified that he put the bulk of the cash back into his separate investing account after "the financial situation stabilized in the country."  The court found this testimony credible and sufficient to overcome the presumption that Steve intended to donate the cash to the marital estate.[68]  The court did not clearly err in discerning Steve's intent regarding the cash; nor did it err in determining that the cash remained his separate property.

### D.	It Was An Abuse Of Discretion To Recapture $80,000 Without Analysis.

When Julie and Steve separated, Julie withdrew $80,000 from the parties' joint account.  In its final property distribution, the court counted that money as part of Julie's share of the marital estate.  Julie argues that the $80,000 should have been classified as interim spousal support because she used the assets for "for living expenses consistent with her reasonable expenses during marriage."  Steve argues that the court did not abuse its discretion by declining to count the $80,000 as interim support because Julie misrepresents the money available to her during separation.[69]

While we do not agree that the superior court abused its discretion by not classifying the money as interim spousal support,[70] we conclude that it was an abuse of discretion to value the money at the time of separation without making specific factual

---

[67]	*Id.* (explaining that placing property in joint title is presumptive evidence of intent to convey separate property to marital estate and shifts burden of proof to owning spouse).

[68]	*See Josephine B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 174 P.3d 217, 222 (Alaska 2007).

[69]	Steve also argues that Julie did not raise the issue of interim support until her motion for reconsideration, but Julie requested alimony in her trial brief and the superior court addressed this issue on the merits.

[70]	*See Day v. Williams*, 285 P.3d 256, 264 (Alaska 2012) (noting "no authority" supports "notion that unilateral expenditures of marital funds, where the party does not request an interim support order, should be treated as interim support").

findings supporting that approach. In *Day v. Williams*, we reiterated that while "[d]issipation of marital assets justifies a valuation at the time of separation," when the superior court "recaptures" an asset by valuing it at the time of separation it must make "findings of fact that the asset[] in question [was] actually wasted, dissipated, or converted to non-marital form."[71] "[A]bsent specific . . . findings of dissipation, waste, or conversion to non-marital form," it is an abuse of discretion to recapture such an asset.[72] And marital assets that are spent on "normal living expenses" after separation are not typically counted against a party in the final property division.[73]

Here, the court did not make factual findings supporting its decision to essentially recapture the $80,000 and count it towards Julie's distribution of the marital estate. The record suggests that Julie used some of the funds to pay for "normal living expenses" like food, gas, car and health maintenance, and child-related expenses. The superior court did not discuss this evidence or analyze what portion of the $80,000 was "actually wasted, dissipated, or converted to non-marital form."[74] We remand for the superior court to determine what portion of the $80,000 was not spent on reasonable living expenses and thus should be recaptured.[75]

---

[71] *Id.* (first alteration in original) (quoting *Miller v. Miller*, 105 P.3d 1136, 1144 (Alaska 2005)).

[72] *Faris v. Taylor*, 444 P.3d 180, 186-87 (Alaska 2019) ("Parties who control a marital asset during separation may be required to compensate the other party if they dissipate or waste the asset or convert it to non-marital form.").

[73] *Day*, 285 P.3d at 264 (quoting *Partridge v. Partridge*, 239 P.3d 680, 692 (Alaska 2010)).

[74] *Id.* (quoting *Ethelbah v. Walker*, 225 P.3d 1082, 1090 (Alaska 2009)).

[75] *See id.*

**E. It Was Error To Base The Child Support Award On A Claimed But Unsupported Tax Calculation.**

Julie argues that the court erred when it reduced Steve's annual income by $24,000 for child support purposes "based on his claimed *marginal* (and not *actual*) tax rate." She also contends that the court erred by failing to count the value of assets Steve "regularly" liquidates as "income" for purposes of child support. Steve concedes that he liquidates assets, but argues "the liquidation of assets is not income" for child support purposes unless the capital gains are taxed as income. He does not otherwise address the tax issue.

Under Alaska Civil Rule 90.3, "adjusted annual income" is a parent's "total income from all sources minus . . . mandatory deductions" including "federal, state, and local income tax."[76] The commentary to this rule explains that a parent claiming a deduction of income from taxes "must provide evidence to support it."[77]

The court factored mandatory distributions from Steve's retirement accounts into its child support award, but overruled Julie's "objection regarding inclusion of the proceeds of any sale from securities as income" because Steve incurred a loss from those sales. It also credited Steve's claimed tax rate of 24% in its final child support order. The court properly determined that the sale of securities resulting in a loss is not counted as income for child support purposes; only sales resulting in recurring capital gains are counted in Alaska.[78] In addition, the court properly looked

---

[76]   Alaska R. Civ. P. 90.3(a)(1)(A)(i).

[77]   Alaska R. Civ. P. 90.3 cmt. E.

[78]   *See Caldwell v. State*, 105 P.3d 570, 574 (Alaska 2005) (holding proceeds from sale of husband's corporate stock "would amount to income [for purposes of child support] only to the extent that they represented capital gains"); *see also Berry v. Stockard*, No. S-15997, 2016 WL 5956640, at *6 (Alaska Oct. 12, 2016) ("Alaska explicitly differentiates between recurring and nonrecurring capital gains and provides that only recurring capital gains may be included in income.").

to Steve's marginal tax rate rather than actual taxes paid in calculating his income for purposes of determining child support.[79]

However, it was error to accept Steve's claimed tax rate without any supporting evidence. In his proposed child support calculation, Steve claimed a tax rate of 24% as a "[s]ingle [person with income] between $89,000.00 and $170,000.00" without referencing where he obtained the figure or referencing the applicable Internal Revenue Service Tax Rate schedule. Further, Steve did not address Julie's argument or reassert his claimed tax rate of 24% on appeal. We therefore remand for further evaluation of Steve's federal income tax liability, and direct the court to recalculate Steve's child support obligation based on his corrected liability.

## V.    CONCLUSION

We AFFIRM in part and REVERSE in part the superior court's judgment and REMAND for further proceedings consistent with this opinion.

---

[79]    *See Berry*, 2016 WL 5956640, at *8 ("A parent's federal income tax *liability*, not the amount of tax that the parent actually paid, is the amount that should be deducted under Rule 90.3." (emphasis in original) (citing *Heustess v. Kelley-Heustess*, 259 P.3d 462, 470 (Alaska 2011))).