**Lorne C. MILLER, Appellant,**

v.

**Violeta E. MILLER, Appellee.**

**No. S–11122.**

Supreme Court of Alaska.

Jan. 28, 2005.

applicable because of material change of circumstances).

William T. Ford, Anchorage, for Appellant.

Allison E. Mendel, Mendel & Associates, Anchorage, for Appellee.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

Lorne C. (Chad) and Violeta Miller were divorced in 2003 after fifteen years of marriage. Chad Miller appeals the superior

court's property division and its award of attorney's fees. He argues that the court made insufficient findings to support its decision, that it incorrectly classified as marital property the family home and a cash gift to Chad, that it overvalued the marital estate, and that it required him to pay excessive attorney's fees. Because the trial court's findings are sufficient and supported by the record, we affirm the court's classification of the marital home and cash gift as marital property and its attorney's fees award. Because Chad has not demonstrated that the court's valuation of the marital estate was clearly erroneous, we affirm the superior court in this regard as well.

## II. FACTS AND PROCEEDINGS

Chad and Violeta Miller were married in May 1988 and permanently separated in March 2001. Chad filed for divorce in May 2001. Two children were born of the marriage, in 1989 and 1990.[1] Violeta was a mother and homemaker during much of the marriage, and Chad worked as an electrician and occasionally for his family's business.

During the marriage, the family lived in a home given to Chad by his mother, Molly Miller, one week before his marriage to Violeta. The parties lived in this home until they separated in March 2001. In 1998 Molly Miller also gave a large cash gift to Chad. Although Chad initially placed this money in an investment account bearing his name alone, he later transferred the funds to a joint account bearing both his and Violeta's names. At a bench trial held in March 2003 to resolve disputes about property division, Violeta testified that she believed that these funds were marital property because her name was on the account. Chad testified that he considered the funds to be separate property and that he added Violeta's name to the account strictly for probate purposes.

The investment account grew from an initial investment of $230,000 in 1998 to $290,000 in 2000, but the balance had dropped to $173,729 by the time the parties separated in March 2001. Chad testified that this decline was due to market losses. After the parties separated, however, Chad began to spend vast sums of money on personal items, living expenses, gifts, and internet gambling, depleting the account by more than $94,000 by the end of May 2001, the month he filed for divorce. By October 31, 2001 this account had a zero balance, despite a pretrial order issued on May 16, 2001 enjoining the parties from using marital property for any purpose other than personal and necessary expenses. Chad Miller testified that he spent the money because his investments were declining in value and he wanted to use the money himself rather than lose it in the stock market. He claimed that he saw nothing wrong with spending this money after separation because he thought the money was his separate property and no one had informed him that it was inappropriate to do so if he was contemplating a divorce.

The superior court issued a decision on June 6, 2003 holding that the marital home, though originally Chad's separate property, was transmuted into marital property over the thirteen years the parties lived there together. The court also found that the cash gift from Chad's mother was transmuted into marital property when Chad intentionally placed the funds into a joint account and used the account for marital purposes. The court divided the marital property equally pursuant to a property valuation proposed by Violeta and ordered Chad to make a cash payment to Violeta in the amount of $123,269. The court had earlier ordered Chad to pay $10,000 for Violeta's attorney's fees and, following entry of judgment, it ordered Chad to pay an additional $10,000 toward Violeta's fees.

Chad appeals.

## III. STANDARDS OF REVIEW

The division of property in a divorce action is a matter committed to the discretion of the trial court.[2] Property division entails a three-step process: (1) determination of what property is marital and available for distribution, (2) valuation of the

---

1. No custody or support issues are before us on appeal.

2. *See* AS 25.24.160(a); *Sampson v. Sampson,* 14 P.3d 272, 275 (Alaska 2000).

property, and (3) equitable distribution of the property.[3] The court's application of this three-step process will be reviewed under the abuse of discretion standard and its rulings will not be overturned unless clearly unjust.[4] The law presumes that an equal division of property is equitable.[5] A trial court's determination that the parties intended to treat property as marital is reviewed for clear error, as is the court's valuation of marital property.[6] Whether the court's findings are sufficiently clear is a matter of law which we review *de novo*.[7]

## IV. DISCUSSION

### A. The Superior Court Did Not Err in Adopting Violeta's Findings of Fact and Conclusions of Law.

 Chad argues that the superior court erred by adopting Violeta's proposed findings of fact and conclusions of law without making any independent findings to justify its decision. He claims that the court's failure to make independent findings violates Alaska Civil Rule 52(a)[8] as we construed it in *Fairbanks Builders, Inc. v. Morton DeLima, Inc.*,[9] because there is no basis upon which to identify the court's independent view of the evidence. This argument is without merit.

 A superior court has an obligation to make clear and explicit findings to support its decisions.[10] In *Fairbanks Builders*, we noted that the trial court's adoption of counsel's findings, which did not provide any jus-

tification for its award of damages, was tantamount to an improper delegation of the "trial judge's primary duty under Civil Rule 52 of finding the facts specially."[11] But a trial court can adopt findings and conclusions prepared by counsel so long as they reflect the court's independent view of the evidence.[12] We are convinced that the trial court in this case adopted Violeta's proposed findings because it agreed with them *in toto*.

The findings clearly and explicitly articulated the grounds upon which the court identified the property available for distribution, the value it placed on that property, and the division it found most equitable. The findings are thus sufficiently detailed to permit appellate review. It appears that Chad attacks not the adequacy of the findings, but the court's characterization of the marital home and the cash gift from Molly Miller as marital property and its valuation of that property. But whether the trial court's findings were erroneous is a different matter altogether from whether they were sufficiently clear and explicit to permit appellate review, which is what is required by Alaska Civil Rule 52(a).[13]

### B. The Superior Court Correctly Classified the Marital Home and a Cash Gift to Chad Miller as Marital Property.

#### 1. Marital Home

 Chad Miller argues that the superior court erred in classifying the family home as

---

3. *Wanberg v. Wanberg*, 664 P.2d 568, 570 (Alaska 1983).

4. *Sampson*, 14 P.3d at 275.

5. *Lundquist v. Lundquist*, 923 P.2d 42, 53 (Alaska 1996).

6. *Cox v. Cox*, 882 P.2d 909, 913–14 (Alaska 1994).

7. *Rausch v. Devine*, 80 P.3d 733, 737 (Alaska 2003) (questions of law are reviewed *de novo*). The adequacy of a court's findings is a matter of procedural law. *Fairbanks Builders, Inc. v. Morton DeLima, Inc.*, 483 P.2d 194, 196–97 (Alaska 1971).

8. This rule states, in relevant part: "In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts

specially and state separately its conclusions of law thereon...."

9. 483 P.2d 194 (Alaska 1971).

10. *See, e.g., Mapco Express, Inc. v. Faulk*, 24 P.3d 531, 543 (Alaska 2001).

11. *Fairbanks Builders*, 483 P.2d at 196–97. We nonetheless declined to vacate the award because Fairbanks Builders failed to argue that the award itself was erroneous. *Id.* at 197–98.

12. *Indust. Indem. Co. v. Wick Const. Co.*, 680 P.2d 1100, 1108 (Alaska 1984).

13. *See Sullivan v. Subramanian*, 2 P.3d 66, 69 (Alaska 2000) (findings and conclusions should be so clear and explicit as to give supreme court clear understanding of basis for decision).

marital property subject to equitable distribution. While he acknowledges that a premarital home owned by one spouse can transmute into marital property if it is used as the primary marital residence,[14] he claims that the home remains his separate property because the parties always viewed it as such. Alternatively, he argued below that if any portion of the home's value was marital property, it would be only that amount by which the home appreciated in value during the marriage. On appeal, he advances a different alternative argument: that the superior court abused its discretion by failing to apply the *Merrill* factors.[15] Chad's principal argument is not supported by the record. His first alternative argument is incorrect as a matter of law, while the second was waived by failure to present it to the superior court.

 Property owned by one party as separate property becomes marital property if the parties demonstrate an intent to treat the property as marital.[16] In determining whether a home should be treated as marital property, a court will consider factors such as: (1) use of the property as the parties' personal residence, (2) both parties' participation in ongoing maintenance and management, (3) placing title in joint ownership, and (4) using the credit of the non-titled party to improve the property.[17]

The superior court found that although the home was originally a gift to Chad from Molly Miller prior to his marriage to Violeta, the residence was transmuted from separate to marital property by the actions of the parties over the thirteen years that they lived there together. The court found that taxes, insurance, and maintenance expenses were paid from marital property; that Viole-

ta cleaned and maintained the house during the marriage; and that Chad made no attempts to maintain the separate character of this property. These factual findings are supported by the record. The parties lived together in the home for a substantial period of time and both of them contributed toward maintenance and upkeep. The superior court's determination that the parties intended to treat the home as marital property was not clearly erroneous.

 Chad also argued before the superior court that, if any portion of the home is marital property, it would be only that portion representing its appreciation in value during the time the parties lived together. He claimed that the court should at most award Violeta only one-half of the increased value rather than one-half of the total value of the home. This argument ignores the differences between the theories of transmutation and active appreciation. While separate property can become marital property under either theory, transmutation converts an asset entirely from separate to marital, while active appreciation converts to marital property only the increase in an asset's value due to a contribution of marital funds or efforts.[18] These theories are mutually exclusive, and we have previously held that if separate property is transmuted into marital property, the trial court must allocate the entire equity in the property rather than just the appreciation in value.[19] The parties stipulated that the home was worth $144,000. The house was unencumbered through March 2001 when the parties separated, and thus the superior court correctly determined that the full equity value was marital property.[20]

---

**14.** *See, e.g., Chotiner v. Chotiner*, 829 P.2d 829, 832 (Alaska 1992).

**15.** *Merrill v. Merrill*, 368 P.2d 546, 547 n. 4 (Alaska 1962).

**16.** *Cox v. Cox*, 882 P.2d 909, 916 (Alaska 1994).

**17.** *Id.*

**18.** *See, e.g., Harrower v. Harrower*, 71 P.3d 854, 857–58 (Alaska 2003) (discussing differences between transmutation and active appreciation).

**19.** *Compton v. Compton*, 902 P.2d 805, 812 (Alaska 1995).

**20.** While Chad took out a loan against the property in 2002, ostensibly to pay expenses related to this litigation, it would be improper to reduce the equity value of the marital home based upon debt incurred after separation and the filing of divorce, particularly where, as here, a party has spent an immense sum of money on discretionary expenses shortly after separation. *See Dodson v. Dodson*, 955 P.2d 902, 910 (Alaska 1998) (debt acquired after physical separation was separate property); *Foster v. Foster*, 883 P.2d 397, 399 (Alaska 1994) (date marriage ceases to function as single economic unit, typically date of separation, is time after which newly-acquired property is non-marital). The revolving line of

▮▮▮ Perhaps recognizing that the active appreciation argument he made below was inconsistent with transmutation, Chad argues on appeal that his contention before the superior court that Violeta should be awarded one-half the amount by which the house appreciated during the marriage was only "a short-hand method of backing out the premarital value of the home, believing that an equitable division of this asset should weigh heavily in his favor because it was [a] gift from his family." Chad then argues that the superior court erred in not applying the *Merrill* factors to the home to determine an appropriate division. Because Chad did not make this argument to the superior court, arguing only an active appreciation theory to that court (as an alternative to his principal argument that the house was his separate property), we decline to address it here.[21]

### 2. Investment Account

▮▮▮ Chad also argues that the court erred in classifying as marital property an investment account opened with funds given to him by his mother. He claims that this gift was an advancement on his inheritance that remained his separate property throughout the marriage. The superior court found that these funds were transmuted into marital property when Chad transferred them from an account in his name alone into an account in the parties' joint names. This finding is not clearly erroneous.

Molly Miller gifted Chad $230,000 in 1998. With these funds he opened an investment account in his own name at Morgan Stanley Dean Witter, listing Violeta and his children as beneficiaries of equal shares in the event of his death. Approximately one year later, these funds were transferred to a joint account in the names of both Chad and Violeta. Under this account the parties were joint tenants with rights of survivorship, so if one party died before the other, the surviving spouse would receive the entire account balance. At trial Chad testified that he transferred the funds to a joint account so that if he died before Violeta the funds would transfer to her without going through probate, but that he was fully in control of the account because it was his inheritance.

▮▮▮ Inherited property is separate, even if received during marriage, though it can be transmuted into marital property where that is the intent of the owner.[22] There is a strong presumption that placing separate property into a joint account demonstrates an intent to treat the property as marital.[23] Thus, absent evidence to the contrary, Chad's decision to move the funds into a joint account will be viewed as a demonstration of his intent to treat the property as marital.[24] Chad argues that this presumption is rebutted by Violeta's testimony that she never tried to access the funds and by Chad's testimony that the joint account was created strictly for probate purposes.

While Violeta testified that she never attempted to access funds from the joint account, she also stated that she considered the account to be marital property because her name was on it, and that the parties used these funds for ongoing household expenses such as taxes. The trial court found that the fact that Violeta never made withdrawals from the account was insignificant given Chad's general unwillingness to allow Violeta to participate in major decisions or to exercise control over the family's finances.

Furthermore, the evidence does not support Chad's claim that account ownership was changed solely for probate purposes. At trial Chad testified that he put the account in joint ownership in 1999 on the recommendation of his mother because of the delays and costs the family experienced dealing with the probate process after the death of Chad's

---

credit secured against the Anchorage home is Chad's separate property.

**21.** See *Hoffman Constr. Co. v. U.S. Fabrication & Erection, Inc.*, 32 P.3d 346, 355 (Alaska 2001) ("As a general rule, we will not consider arguments for the first time on appeal.").

**22.** *Sampson v. Sampson*, 14 P.3d 272, 276 (Alaska 2000); *Chotiner v. Chotiner*, 829 P.2d 829, 832 (Alaska 1992).

**23.** *Brown v. Brown*, 947 P.2d 307, 311 (Alaska 1997) (quoting *Chotiner*, 829 P.2d at 833).

**24.** *Lewis v. Lewis*, 785 P.2d 550, 555 (Alaska 1990).

father. Chad claimed that joint ownership would ensure that Violeta got the funds automatically upon his death. But earlier he also testified that the house was put into his name alone based upon the advice of his mother because she "knows about probate" and "it would be best if [the house] was in my name free and clear, before I get married, so that if something did go wrong later with the marriage, that [Violeta] couldn't try to take the whole thing." It appears that Chad's father died in the early 1980s, well before Molly's gift of the Anchorage home in 1988 and her subsequent cash gift in 1998. If the ownership decisions were made to avoid problems with probate, it would make little sense to maintain sole title to the home while placing the investment account in joint ownership.

The trial court's finding that the investment account transmuted to marital property was not clearly erroneous.

## C. The Superior Court's Valuation of the Marital Estate Was Not Clearly Erroneous.

██ Chad also argues that the superior court erred in valuing the investment account and numerous items purchased with funds from that account. He claims that although an annuity listed as marital property was cashed in and the funds spent shortly after the parties separated, the trial court nonetheless counted as part of the marital estate the value of the annuity *and* the items purchased after it was cashed in, thus double-counting the annuity. He also claims that the trial court erred by failing to conduct an independent valuation of the property he purchased shortly after the parties separated. Because Chad has failed to demonstrate that the court's valuation of the marital estate was clearly erroneous, we affirm that part of its decision as well.

At trial Violeta's counsel argued that the marital estate included the $173,729.45 value

of the Morgan Stanley Dean Witter account as of the date of separation. Chad acknowledged that this account had a balance of $173,000 when the parties separated, though, as discussed above, he argued that this was his separate property. Although these funds had been spent by the time of trial, Violeta's counsel argued that any property purchased from this account should be valued at its purchase price since Chad was not authorized to convert the cash into assets that depreciate rapidly. Violeta's proposed property distribution, which was adopted by the superior court, was based in large part upon information provided by Chad prior to trial, including his initial disclosures and a summary of the property he purchased after the parties separated. The parties stipulated to the value of the marital home and Chad's pension, and the vehicles were appraised. The values for almost all additional marital property were based upon information provided by Chad. The court valued the marital estate at $432,226 [25] and ordered Chad to make a cash payment to Violeta in the amount of $123,269.

██ This court has consistently held that the date for classification of property is that of separation, but that property should be valued as close as possible to the date of trial.[26] The findings adopted by the superior court indicate that the parties separated on "May 16, 2002 when Chad Miller filed this action." This is apparently a typographical error since Chad filed for divorce on May 16, 2001 and the parties agreed before trial that the date of separation was March 25, 2001. As of that date, the Morgan Stanley Dean Witter account had a cash balance of at least $173,729.45,[27] an amount corroborated by account records and Chad's trial testimony. Included in this sum was an annuity valued at approximately $101,000, which was later cashed in.

---

**25.** The home, pension, and vehicles were valued at $243,739. The balance of $188,487 was comprised of personal property and cash in Chad's investment account at the time of separation.

**26.** *See, e.g., Leis v. Hustad,* 22 P.3d 885, 888 (Alaska 2001).

**27.** The account balance on March 31, 2001 was $173,729.45. Because there is no evidence that funds were deposited into this account after separation, we assume that the balance on March 25, 2001 was at least $173,729.45.

In the weeks after separation, Chad spent an enormous amount of money, depleting the account by $68,503.49 in the month of April 2001 alone. He used the funds on items such as an $18,000 all-terrain vehicle, a $32,000 custom-made travel trailer, an $11,750 emerald ring for Violeta, and thousands of dollars of internet gambling. Chad also testified that he took the children out to dinner nightly, spending at least $100 each night.

There is no merit to Chad's claim that the property distribution overstated the available property by the entire value of the annuity. While the property distribution adopted by the court includes an annuity valued at $101,000, Violeta's counsel explained that this item was incorrectly labeled and that this sum represented the account balance after Chad cashed in the annuity in March 2001. Financial records from this account show that there was a balance of $105,225.96 [28] on April 30, 2001 after Chad spent nearly $70,000 on the travel trailer, emerald ring, and other property that month. The court's distribution included cash and personal property in Chad's possession at the time of separation valued at $188,487.[29] While the property distribution incorrectly classified cash as an annuity, there is no evidence that the annuity was double-counted.

 Chad also argues that the court erred in valuing the property he purchased from this account at its purchase price rather than its fair market value at the time of trial. As Violeta's counsel noted at trial, much of this property is of a type that depreciates rapidly, such as tools, electronic equipment, recreational vehicles, camping gear, exercise equipment, and automobile upgrades. While a trial court should normally value property at the time of trial it can, in special circumstances, value the property at the time of

separation, so long as the court makes specific findings regarding why the earlier date is proper.[30] Dissipation of marital assets justifies a valuation at the time of separation.[31] The court's findings specifically note that Chad rapidly dissipated the investment account after separation. Furthermore, Chad has alleged no specific error in the court's valuation of any property. Nearly all property was valued by stipulation, appraisal, or from information provided by Chad himself. Chad's appeal does not identify any property that was overvalued, nor could his counsel identify any such property at oral argument. Accordingly, Chad has failed to demonstrate clear error in the court's valuation of the marital estate.

### D. The Superior Court Did Not Err in Awarding Attorney's Fees.

 Finally, Chad argues that the court abused its discretion by ordering him to pay $20,000 of Violeta's attorney's fees, and that it erred by failing to credit him for an interim award he had already paid. There is no evidence that the trial court abused its discretion in making this award.

An award of attorney's fees in a divorce action should be based upon the relative economic situations and earning powers of the parties.[32] A trial court has broad discretion to award attorney's fees in a divorce action, and we will not overturn such an award unless it is arbitrary, capricious, or manifestly unreasonable.[33] The trial court entered an interim award in April 2002 ordering Chad to pay Violeta $10,000 toward her attorney's fees. The court indicated that this amount was an advance against the ultimate fee award entered in the action. In September 2003, three months after entry of decision regarding the property distribution, the

28. Violeta's counsel explains that the account balance was incorrectly listed as $101,000 rather than $105,000, but that this discrepancy works to Chad's benefit.

29. *See supra* note 25. The difference between this sum and the $173,729 cash balance at separation represents the value of marital property already in Chad's sole possession at separation.

30. *Cox v. Cox*, 882 P.2d 909, 917 (Alaska 1994).

31. *Id.* at 918 n. 5. To recapture dissipated funds, the court gives the property an earlier valuation date and credits all or part of that valuation to the party that controlled the asset. *Foster v. Foster*, 883 P.2d 397, 399 (Alaska 1994).

32. *Kowalski v. Kowalski*, 806 P.2d 1368, 1372 (Alaska 1991).

33. *Sloane v. Sloane*, 18 P.3d 60, 64 (Alaska 2001).

court awarded Violeta an additional $10,000, noting that this sum was in addition to the interim fees already awarded.[34] The court justified the total award of $20,000, which represented approximately two-thirds of Violeta's total fees,[35] solely on the basis of Chad's superior economic position, though it noted that the record would support a finding that Chad had engaged in vexatious conduct throughout the litigation.

Chad claims that the total award was too high since the court ordered an equal division of marital property. But the court's order specifically noted that Violeta's fees were higher than normal because her counsel had to reconstruct the value of assets that Chad dissipated after separation, a process made even more difficult because Chad was not fully cooperative. Violeta incurred these fees while establishing the value of the marital estate and her right to an equal share. The court did not abuse its discretion in its fee award.

## V. CONCLUSION

For the foregoing reasons we AFFIRM the decision of the superior court in all respects.

---

**34.** Because this award was entered after Chad appealed to this court and Chad never amended his appeal to include this order, Violeta argues that Chad has waived the right to contest the award of fees. But Chad's points on appeal claimed error in the court's award of attorney's fees, so Violeta was on notice that this issue would be contested, and the issue was adequately briefed. Accordingly, Chad preserved the right to appeal the fee award. *See Winn v. Mannhal-*

*ter*, 708 P.2d 444, 449 (Alaska 1985) (issue preserved if raised at trial, adequately briefed on appeal, and opposing counsel sufficiently apprised of issue presented).

**35.** Violeta's total attorney's fees were $34,860.19, while Chad's total fees were approximately $10,000.