**NOTICE**

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

## THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| JADA M., | ) | |
| | ) | Supreme Court No. S-19333 |
| Appellant, | ) | |
| | ) | Superior Court No. 4FA-21-00100 CN |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| STATE OF ALASKA, DEPARTMENT | ) | AND JUDGMENT* |
| OF FAMILY & COMMUNITY | ) | |
| SERVICES, OFFICE OF CHILDREN'S | ) | No. 2121 – December 3, 2025 |
| SERVICES, | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Kirk Schwalm, Judge.

Appearances: Megan M. Rowe, Anchorage, for Appellant. Jennifer Teitell, Assistant Attorney General, Anchorage, and Treg Taylor, Attorney General, Juneau, for Appellee.

Before: Carney, Chief Justice, and Borghesan, Henderson, Pate, and Oravec, Justices.

## I.    INTRODUCTION

The superior court terminated a mother's parental rights to a child in proceedings governed by the Indian Child Welfare Act (ICWA).[1] The mother appeals the decision, arguing that the superior court erred in finding that (1) the Office of

---

\*    Entered under Alaska Appellate Rule 214.

[1]    25 U.S.C. §§ 1901-1923.

Children's Services (OCS) made active efforts to reunify the family, (2) she was given a reasonable amount of time to remedy the behaviors and conditions placing her child at risk, (3) the child was at substantial risk of suffering mental or physical damage if returned to her, and (4) termination was in the child's best interest. Seeing no factual or legal errors in the superior court's rulings, we affirm its order.

## II.  FACTS AND PROCEEDINGS

### A.  Facts

Tye was born to Jada M. in February 2020.[2] Tye's father is unknown. Tye is an Indian child within the meaning of ICWA.[3]

### B.  Proceedings

In May 2021 OCS filed an emergency petition seeking to place Tye in its temporary custody. The petition asserted that Jada had attempted, while under the influence of drugs and alcohol, to take physical control of Tye from a frequent caregiver named Lionel, and the police were called. Lionel told the police he had been caring for Tye since August 2020. Because Lionel had no legal authority to care for Tye and Jada was under the influence of drugs and alcohol, OCS was called to take temporary custody of Tye. OCS's petition alleged that Tye was at risk of harm due to neglect, physical abuse, and Jada's substance abuse.

After emergency hearings, the superior court found that Tye was a child in need of aid due to neglect and parental substance abuse. The court granted OCS temporary custody of Tye. OCS placed Tye with his maternal grandmother. The tribe in which Tye is eligible for membership later intervened in the proceedings.[4]

---

[2]  We use pseudonyms to protect the family's privacy.

[3]  25 U.S.C. § 1903(4).

[4]  We refer to "the Tribe" or "Tye's Tribe" rather than its proper name to protect the family's privacy.

In July 2021 OCS workers made initial efforts to create a case plan with Jada, gave her cab vouchers for transportation, and provided Jada with resources to obtain housing. In August OCS made a case plan with Jada's participation. At that time Jada was reportedly drinking alcohol and using methamphetamine daily and was homeless. The concrete goals in Jada's plan included completing random drug testing, visiting Tye at scheduled times, participating in parenting and domestic violence classes, locating safe housing and applying for rental assistance, and completing a substance abuse and mental health assessment. The primary goal of the case plan was reunification with Tye.

As a result of these efforts, Jada was able to enter intensive drug treatment in October 2021. But according to OCS, she left treatment after just one day and did not complete the program.

Over the next two years, Jada attempted treatment multiple times with OCS's assistance, but never completed it. During this time period OCS also offered housing assistance to Jada on several occasions, but Jada did not accept it or follow through with the steps needed to obtain housing. OCS provided transportation assistance like cab and bus vouchers. OCS also provided Jada visitation with Tye; she attended about half of the scheduled visits.

OCS also took steps to find a suitable long-term placement for Tye.[5] OCS sought to place Tye with Jada's sister in North Dakota, a placement supported by the Tribe. OCS submitted an application under the Interstate Compact for the Placement of Children (ICPC) in the spring of 2024. But North Dakota authorities denied the application to place Tye with Jada's sister. OCS also attempted to reach Tye's adult sister for placement but was initially unable to make contact. When OCS did reach her,

---

[5] While Tye was initially placed with his maternal grandmother, the record reveals disagreement between the parties about whether she desired long-term placement of Tye.

she was only willing to take placement in an emergency and supported placement with Lionel or Tye's maternal grandmother. In addition, OCS tested several men for paternity but was unsuccessful in finding Tye's father.

In January 2024 OCS petitioned for termination of Jada's parental rights to Tye. A four-day trial was held in August 2024. During the trial the superior court heard testimony from OCS case workers, two expert witnesses, and two witnesses called by Jada. One expert testified about the general dangers to which children are exposed when their parents abuse alcohol or drugs, the specific dangers that Jada's substance abuse posed to Tye, and the importance of permanency for young children. The other expert witness testified about the Tribe's view of Jada's parenting and the risk it posed to Tye. Jada's witnesses testified primarily about Tye's placement.

The superior court also heard testimony from Lionel, who had had an on-again, off-again romantic relationship with Jada for years. He testified that he was involved in Tye's life from birth but started providing full-time care to Tye in August 2020. According to Lionel, after OCS took custody and placed Tye with his grandmother, Tye continued to spend much of the time in Lionel's care.[6] Lionel testified that after he began to leave Tye in his grandmother's care for longer periods of time, Tye showed signs of distress, which Lionel attributed to the separation. So Tye returned to spending most of his time with Lionel, an arrangement that continued through trial. Lionel testified that he worked to maintain Tye's bonds with his biological family and that if he could adopt Tye, he would allow Jada to be a part of Tye's life.

---

[6] This testimony was corroborated by OCS.

Before the final day of trial, in September 2024, Tye's Tribe passed resolutions approving Lionel as a placement for Tye in accordance with ICWA's placement preferences.[7]

In December 2024 the superior court issued an order terminating Jada's parental rights to Tye.

The superior court found that Tye was a child in need of aid under AS 47.10.011(9) and (10) due to Jada's substance abuse and resulting neglect of Tye. The court also found by clear and convincing evidence that Jada did not remedy the conduct or conditions that placed Tye at substantial risk of harm. It observed that Jada continued to abuse substances, did not have stable housing, and could not meet Tye's basic needs.

The court found by clear and convincing evidence that OCS made reasonable efforts to provide remedial services to Jada. Among these efforts, the court counted visitation, which it noted that Jada frequently missed; referrals for assessment, testing, and treatment for Jada's substance abuse; efforts to place Tye with extended family; attempts at making a case plan with Jada's input; and offering help with housing and parenting classes.

Citing the testimony of the two expert witnesses, the court found beyond a reasonable doubt that Tye would likely suffer serious emotional or physical damage if Jada had continued custody.

Finally, the court found by a preponderance of the evidence that termination of Jada's parental rights was in Tye's best interests. The court found that Tye had been in State custody for most of his life; Jada had never meaningfully engaged

---

[7] ICWA establishes preferences for the foster care placement of an Indian child, with the top preference being a member of the child's extended family. 25 U.S.C. § 1915(b). But ICWA also authorizes the Indian child's tribe to designate a different order of preference by resolution. 25 U.S.C. § 1915(c)

in her case plans; Tye could not be returned to Jada in a reasonable time; his young age made permanency especially important; and it was likely that Jada's drug abuse and homelessness would continue.

Jada appeals.

## III. DISCUSSION

### A. The Record Supports The Conclusion That OCS Made Active Efforts To Reunite The Family.

The superior court may not terminate parental rights to an Indian child unless there is clear and convincing evidence that OCS has made active efforts "to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."[8] The Bureau of Indian Affairs has defined active efforts to mean "affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family."[9] Whether OCS has made active efforts is a mixed question of law and fact.[10] Factual questions, such as what services OCS provided, are reviewed for clear error.[11] The ultimate question of whether OCS's efforts were sufficiently active to satisfy ICWA is a legal question we review de novo.[12]

In Jada's case, the superior court found that OCS attempted to make a case plan for Jada to regain custody of Tye; attempted to assist Jada with housing and parenting classes; offered her substance abuse treatment, drug testing, and recovery

---

[8] 25 U.S.C. § 1912(d); CINA Rule 18(c)(2)(B).

[9] 25 C.F.R. § 23.2 (2016). CINA Rule 23.2 defines active efforts in the same way.

[10] *Ben M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 204 P.3d 1013, 1018 (Alaska), *as amended on reh'g* (Apr. 21, 2009).

[11] *Id.* (ruling trial court's findings regarding OCS's efforts were not clear error).

[12] *E.A. v. State, Div. of Fam. & Youth Servs.*, 46 P.3d 986, 989, 991 (Alaska 2002) (affirming trial court's conclusion that active efforts were made).

resources; placed Tye in his maternal grandmother's care while attempting to find other family placements; and facilitated Jada's visitation with Tye. On appeal Jada does not challenge these factual findings. Rather, she argues that OCS's efforts did not satisfy the legal standard for active efforts.

It is not completely clear what legal standard the superior court applied. The court noted that OCS's burden of proof to show active efforts is by clear and convincing evidence, noted that active efforts is a higher standard than reasonable efforts, and cited federal regulations describing active efforts. But in discussing the record the court concluded that OCS "met its burden of proving reasonable efforts."

In ICWA cases, OCS's duty to make active efforts subsumes the general duty to make reasonable efforts in all child in need of aid cases. Whether OCS made reasonable efforts in an ICWA case is functionally irrelevant; what matters is whether it made active efforts. And the difference matters. Active efforts is a more demanding standard,[13] rooted in the tragic history that prompted Congress to enact ICWA.[14] Therefore, we urge courts to pay close attention to this distinction.

---

[13] *Clark J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 483 P.3d 896, 901 n.13 (Alaska 2021) ("The superior court's termination order referred to both 'reasonable efforts' and 'active efforts.' All cases involving Indian children are subject to ICWA's more stringent 'active efforts' requirement."); *Winston J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 134 P.3d 343, 347 n.18 (Alaska 2006) ("[T]he 'active efforts' requirement of ICWA is more demanding than the 'reasonable efforts' requirement of AS 47.10.086."); *Casey K. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 311 P.3d 637, 646-47 (Alaska 2013) (providing that active efforts standard in ICWA cases imposes higher burden on OCS than reasonable efforts standard).

[14] When Congress enacted ICWA, it described the "wholesale separation of Indian children from their families [a]s perhaps the most tragic and destructive aspect of American Indian life today." H.R. REP. NO. 95-1386 at 9 (1978). In adopting regulations governing ICWA proceedings, the Bureau of Indian Affairs published commentary explaining that the active efforts requirement "is one of the primary tools"

Nevertheless, we affirm the termination order because the question of whether efforts are active is ultimately a legal one. Given the superior court's unchallenged factual findings, we conclude, upon de novo review, that OCS satisfied its duty to make active efforts.

Jada argues that OCS's efforts did not satisfy ICWA's standard for active efforts because they were, she asserts, inflexible and reactive. For example, Jada argues that OCS did not explore options beyond "standard" services. She also criticizes OCS's placement efforts as deficient because its attempt to place Tye with an out-of-state relative was unsuccessful.[15]

We disagree with Jada's characterization of OCS's services. "Active efforts are to be tailored to the facts and circumstances of the case."[16] Although drug treatment may be a "standard" service, as Jada's brief puts it, it was an appropriate one for Jada's circumstances, given her serious substance abuse problem. OCS's attempt to help Jada secure safe housing was also tailored to Jada's particular circumstances.

And contrary to Jada's assertion, OCS did offer her individualized support. For example, in late 2022, with the assistance of OCS, Jada began residential drug treatment. But she left after two days. The OCS worker contacted the program to see if it would be possible for Jada to return, confirmed that it was, and reached out to Jada. But Jada did not return. OCS workers presented Jada with different options for

---

to remedy the frequent failure of state child welfare agencies "to recognize immediate, practical means to reduce the incidence of neglect or separation" among Indian families. Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38,778, 38,790 (June 14, 2016).

[15] Jada also appears to criticize the superior court's emphasis on the amount of visitation OCS offered her. But visitation was just one of the services mentioned by the superior court in support of its ruling that OCS made active efforts. We see no legal error in the court's mention of visitation or in the weight it gave this effort in the active efforts analysis.

[16] 25 C.F.R. § 23.2 (2016); *Mona J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 511 P.3d 553, 561 (Alaska 2022).

treatment, but she rejected most of them and expressed interest only in an out-of-state facility that did not accept Medicaid. OCS also offered to help Jada apply for housing assistance and offered her emergency housing resources at various points during the life of the case. One caseworker testified that around December 2021 Jada had housing assistance funding resources in place once she found an apartment. The caseworker testified that she provided Jada with a specific list of apartments to which she could apply. But according to the testimony, in January 2022, Jada still did not have consistent housing. OCS gave Jada sufficiently individualized support to satisfy the active efforts standard.

Jada's attack on OCS's efforts to secure placement for Tye is also unconvincing. After being taken into OCS custody, Tye was placed in the care of his maternal grandmother. Meanwhile, OCS attempted to find other family placements, including Tye's adult sister. OCS made substantial efforts to determine Tye's paternity. OCS submitted an ICPC application to place Tye with Jada's sister in North Dakota, but North Dakota authorities denied the request. Jada does not point to evidence suggesting this rejection was due to a failure by OCS. And after multiple years of official placement with Tye's grandmother, OCS worked with the Tribe to have placement align with the reality that Lionel had been Tye's primary caregiver and attachment figure for years. Lionel testified that he was willing to support the relationship between Tye and Jada.

Given Jada's unavailability to parent Tye due to her severe addiction and associated behaviors, these placement efforts supported the overall goal of maintaining Jada's connection to Tye. We have given significant weight to OCS's efforts to place a child with "an extended family member who supports the goal of reunification" when

evaluating whether OCS has made active efforts toward a parent who is incarcerated.[17] Although Jada is not incarcerated, her substance abuse issues have made her similarly unavailable as a parent. Therefore, OCS's placement attempts with extended family and eventual placement with Lionel, who supports maintaining the family bond, are also entitled to significant weight.

For these reasons, we affirm the superior court's ruling that there was clear and convincing evidence that OCS made active efforts to prevent the breakup of the family. Indeed, OCS's efforts in this case were commendable.

### B. The Superior Court Did Not Clearly Err In Finding That Jada Failed To Remedy, Within A Reasonable Time, The Behaviors And Conditions That Placed Tye At Substantial Risk Of Harm.

Parental rights may not be terminated unless the superior court finds clear and convincing evidence that the parent failed to remedy, within a reasonable time, the conduct or conditions in the home that placed the child at substantial risk of harm.[18] In this case the court found that Jada had not remedied her conduct because, at the time of trial, she "continue[d] to actively abuse substances, ha[d] unstable housing, and [wa]s not capable of meeting [Tye]'s basic needs."

Jada challenges this finding on appeal. She argues that she was not credited enough for her efforts to attend visitation despite her transportation challenges and points out that some of the visits with Tye were canceled due to reasons outside her control. She also argues that despite her failure to achieve the goals of her case plan, she made steps toward getting treatment, attempted to secure housing, and communicated with OCS. Based on her efforts, and considering the severity of her

---

[17] *Anton K. v. State, Dep't of Fam. & Cmty. Servs., Off. of Child.'s Servs.*, 554 P.3d 456, 467 (Alaska 2024) (crediting placement efforts "directed at preventing the breakup of the family" including placement with "an extended family member who supports the goal of reunification" when parent is incarcerated).

[18] AS 47.10.088(a)(2)(B); CINA Rule 18(c)(1)(A).

substance abuse and the challenge of accessing resources while homeless, she argues that she should have been given more time to remedy her conduct. The time she was allotted was, she argues, not "reasonable."

Whether a parent failed to remedy the conduct or conditions placing a child at substantial risk of harm within a reasonable time is a factual question reviewed for clear error.[19] In making this determination, the court can consider "any fact relating to the best interests of the child."[20] A "reasonable time" is defined by statute as "a period of time that serves the best interests of the child, taking in account the affected child's age, emotional and developmental needs, and ability to form and maintain lasting attachments."[21] For younger children, a reasonable amount of time is often a shorter period given the lasting emotional damage that can result when young children do not form a bond with adult caregivers.[22] Ultimately, the amount of time that is reasonable is determined on a case-by-case basis.[23]

We see no clear error in the superior court's finding that Jada had not remedied her conduct within a reasonable time. First, Jada does not contest the court's factual findings that she "continue[d] to actively abuse substances, ha[d] unstable housing, and [wa]s not capable of meeting [Tye's] basic needs." Although Jada emphasizes some efforts she made to work with OCS and access services, we see no clear error in the superior court's focus on the fundamental reality: that Jada still was

---

[19] *Ralph H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 255 P.3d 1003, 1007-08 (Alaska 2011).

[20] AS 47.10.088(b); s*ee also Amy M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 320 P.3d 253, 260-61 (Alaska 2013).

[21] AS 47.10.990(30).

[22] *Christina J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 254 P.3d 1095, 1107 (Alaska 2011).

[23] *Trevor M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 368 P.3d 607, 612 (Alaska 2016).

not able to safely parent Tye. Second, over three and a half years had passed since Tye had been removed from Jada's care, and he was not even five years old at the time of termination. The superior court emphasized Tye's need for permanency when finding termination of Jada's parental rights was in his best interests. This need for permanency also supports the court's finding that Jada had not remedied her conduct within a reasonable time.[24]

Therefore, we see no clear error in the superior court's failure-to-remedy finding.

### C. The Superior Court Did Not Clearly Err By Finding That Tye Was Likely To Suffer Serious Emotional Or Physical Damage If Returned To Jada.

In cases involving an Indian child, the superior court may not terminate parental rights unless it finds "evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."[25] "Proof that a parent having custody is likely to cause a child serious harm requires evidence that (1) the parent's conduct is likely to harm the child and (2) the parent's conduct is unlikely to change."[26] The likelihood of serious harm may be

---

[24] *See Crittell v. Bingo*, 36 P.3d 634, 639 (Alaska 2001) (explaining that we do not "invariably require that the findings and conclusions be properly labeled . . . so long as the record clearly indicates that the court considered the matter and resolved each critical factual dispute" (quoting *Urb. Dev. Co. v. Dekreon*, 526 P.2d 325, 328 (Alaska 1974))).

[25] 25 U.S.C. § 1912(f).

[26] *Diana P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 355 P.3d 541, 546 (Alaska 2015).

"proved through the testimony of a single expert witness, by aggregating the testimony of expert witnesses, or by aggregating the testimony of expert and lay witnesses."[27]

The superior court's findings on this point were sparse. The court described the ultimate opinions of OCS's expert witnesses: First, "[Tye's] return to [Jada's] case [sic] was likely to result in serious emotional or physical damages to him," and second, "[Jada's] behaviors were inconsistent with tribal values." The court accepted the experts' opinions and found them "consistent with the other evidence in this case." The court found, based on these opinions, that Tye would likely suffer serious emotional or physical damage if returned to Jada.

On appeal Jada argues that the court's decision on this point lacks substantive analysis, contains no specific findings of fact, and fails to explain the nexus between Jada's conduct and the risk of harm to Tye. Although the superior court's findings are brief, they are sufficient for appellate review.[28] The superior court stated its conclusion and the testimony on which it relied to reach that conclusion. Therefore, its findings are "sufficient to give a clear understanding of the grounds upon which it reached its decision."[29]

Having reviewed the experts' testimony, we see no clear error in the superior court's finding that returning Tye to Jada's care would place him at substantial

---

[27]     *Id.* (quoting *Chloe W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 336 P.3d 1258, 1270 (Alaska 2014)).

[28]     Whether the court's findings are sufficiently detailed for appellate review is a legal question to which we apply our independent judgment. *Miller v. Miller*, 105 P.3d 1136, 1140 (Alaska 2005).

[29]     *Annette H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 450 P.3d 259, 266 n.30 (Alaska 2019) (quoting *In re Adoption of Hannah L.*, 390 P.3d 1153, 1157 n.16 (Alaska 2017)).

risk of serious damage.[30]  OCS presented the testimony of a cultural expert witness.[31] The cultural expert testified that, from the Tribe's perspective, returning Tye to Jada would likely result in serious emotional or physical harm to Tye.  He testified that Jada's consistent pattern of substance use while caring for Tye was not considered by the Tribe to be appropriate or acceptable parenting behavior, and that it would likely cause trauma.

OCS also presented the testimony of expert witness Karen Morrison. Morrison testified that based on her review of the case, Jada's substance abuse placed Tye at significant risk of harm.  More specifically, she testified that if Tye were in Jada's custody he would likely suffer serious emotional or physical damage because Jada's substance abuse was uncontrolled and Jada likely would not be able to prioritize Tye or care for him while using drugs.  Morrison identified specific risks of harm:  Tye could be exposed to needles; he could accidentally ingest drugs; and drug use makes parents inattentive to their children's safety, increasing the risk of accidents.  Morrison testified that Jada exhibited strange drug-related behaviors, which can be confusing, scary, and harmful for a child to witness.  Indeed, other evidence showed that Jada suffered from a persistent drug-induced hallucination that worms were eating her face, talked about cutting off parts of her face to get rid of them, and was convinced some of Tye's food was slithering like a snake and infested with translucent parasites.  One of Jada's

---

[30]  Whether returning a child to a parent is likely to result in serious emotional or physical damage to the child is a factual question reviewed for clear error. *Christina J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 254 P.3d 1095, 1104 (Alaska 2011); *Sherman B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 290 P.3d 421, 428 (Alaska 2012).

[31]  We have held that in most cases involving an Indian child, the court may not terminate parental rights without hearing testimony from an expert knowledgeable about the prevailing social and cultural standards of the Indian child's tribe.  *State, Dep't of Health & of Soc. Servs., Off. of Child.'s Servs. v. Cissy A.*, 513 P.3d 999, 1009 (Alaska 2022).

medical providers indicated, in a medical record, that Jada would likely die of her meth addiction.

In light of this evidence, the superior court did not clearly err by finding evidence beyond a reasonable doubt that returning Tye to Jada would place him at serious risk of substantial damage.

**D.      The Superior Court Did Not Clearly Err By Finding That Termination Was In Tye's Best Interests.**

The superior court may terminate parental rights only if it finds, by a preponderance of the evidence, that termination is in the child's best interests.[32]  That is what the court found here, emphasizing Tye's young age, the length of time he had already spent in OCS custody, his need for permanency, and the likelihood that Jada's drug abuse would continue.

On appeal Jada challenges the court's best interests finding.[33]  She argues that the court should have given more weight to the emotional harm to Tye of severing the parent-child bond.  She asserts that Tye had multiple caregivers, which undermined the court's finding that Tye needed permanency.  And she suggests that the superior court should have given more weight to her assertions, through counsel, that she wished to obtain another substance abuse assessment and make another attempt at treatment. These arguments are unpersuasive.

In determining the child's best interests, the superior court "is not required to consider or give particular weight to any specific factor," such as "a parent's desire

---

[32]      CINA Rule 18(c)(3); *see also* AS 47.10.088(c) ("In a proceeding under this chapter involving termination of the parental right of a parent, the court shall consider the best interests of the child.").

[33]      Whether termination is in the child's best interests is a factual question reviewed for clear error.  *Christina J.*, 254 P.3d at 1104; *Sherman B.*, 290 P.3d at 428.

to parent or [their] love for the child."[34]  "The superior court may consider the bonding that has occurred between the child and his foster parents, the need for permanency, and the . . . parent's lack of progress."[35]  Therefore, the superior court was not required to give more weight to the emotional risk associated with severing the parent-child bond.  And in fact, Tye's proposed permanent placement, Lionel, testified that that he has worked to maintain Tye's bonds with his biological family and that if he could adopt Tye, he would allow Jada to be a part of Tye's life.

Jada's assertion that Tye's exposure to multiple caregivers lessens his need for permanency also lacks merit.  First, Tye was consistently cared for by Lionel even when he was officially placed with his maternal grandmother.  And Lionel testified that Tye suffered distress when separated from Lionel for substantial periods of time.  Second, even if Tye had experienced instability due to multiple caregivers, the superior court could reasonably have found that this instability made it all the more important for Tye to have a permanent home.

Lastly, Jada's argument that the court should have given more weight to her counsel's representation that she wanted to try treatment again than to her lengthy history of failing to complete treatment is unpersuasive.  "The superior court is entitled to rely on a parent's documented history of conduct as a predictor of future behavior."[36] Given Jada's documented history of severe drug abuse, and her repeated failure to complete treatment, the superior court was not required to credit her assertion, through counsel, that she was willing to try treatment again.

---

[34]   *Chloe W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 336 P.3d 1258, 1271 (Alaska 2014).

[35]   *Id.* (footnotes omitted).

[36]   *Sherry R. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 74 P.3d 896, 903 (Alaska 2003).

Jada also argues that the superior court's decision does not reflect careful consideration. She points out that the paragraph containing the superior court's best interests analysis included the same sentence twice and ended with a fragment:

> In this case, [Tye] has been in Department custody for the majority of his life—three and a half years. [Jada] has never meaningfully engaged her case plans. [Tye] cannot be returned to [Jada]'s home in any reasonable time frame and his young age makes his need for permanency that much more important. [Jada] has never meaningfully engaged her case plans. Given her history, it is extremely likely her behavior will continue. While [Tye] is bonded to her, she has missed [sic]

Typographical mistakes of this sort risk diminishing the parties' confidence that the court has acted with the degree of care required in a matter as grave as a case involving the termination of parental rights.[37] Yet they do not lead us to conclude that the court's factual determination was wrong. As explained above, ample evidence supports its conclusion that terminating Jada's parental rights was in Tye's best interests.

## IV. CONCLUSION

We AFFIRM the judgment terminating Jada's parental rights.

---

[37] *See In re K.L.J.*, 813 P.2d 276, 279 (Alaska 1991) ("[T]he interest of a parent whose parental rights may be terminated . . . is of the highest magnitude.").